Michael SCHAFIR and Dixie Schafir,
Plaintiffs, Appellants, and Cross–
Appellees,

v.

Michael T. HARRIGAN; Mary L. Harri-
gan; Henry D. Moyle; Jodie Bennion;
AmDevCo, Inc.; Grant E. Wartena;
Stanley M. Price; Robert G. Wilkinson;
and The Home Inspector, Inc., a Utah
corporation; Defendants, Appellees, and
Cross–Appellants.

No. 930287–CA.

Court of Appeals of Utah.

Aug. 16, 1994.

Rehearing Denied Sept. 7, 1994.

Craig G. Adamson and Eric P. Lee, Salt Lake City, for appellants.

James E. Morton, Salt Lake City, for appellees/cross-appellants Michael T. and Mary L. Harrigan.

Dale J. Lambert and Russell G. Workman, Salt Lake City, for appellee Henry D. Moyle.

Paul S. Felt, Salt Lake City, for appellee Jodie Bennion.

Before DAVIS, GREENWOOD and JACKSON, JJ.

## OPINION

GREENWOOD, Judge:

Michael and Dixie Schafir appeal from the trial court's adverse summary judgment ruling. Defendants Michael T. and Mary L. Harrigan cross-appeal the trial court's denial of their motion for an award of attorney fees. We affirm.

## BACKGROUND

In May 1987, the Schafirs purchased a home from the Harrigans located on the east bench of Salt Lake City. Defendant Jodie Bennion was the listing real estate agent for the sale. Approximately three years earlier, defendant AmDevCo Inc., a construction company, had built the home and sold it to the Harrigans. Bennion was also the listing agent on this earlier sale. Defendant Henry D. Moyle, a vice-president and director of AmDevCo, was involved in designing and supervising the construction of the Harrigans' home.[1]

Shortly after purchasing the home from the Harrigans and moving in, the Schafirs

---

1. Also involved in the design and construction of the home were Grant E. Wartena, president and a director of AmDevCo, and Stanley M. Price, a general contractor through whom AmDevCo obtained the building permit to construct the home. The trial court entered default judgments against

claim they discovered numerous design and construction defects. Specifically, the Schafirs assert that at the time of sale the house had the following deficiencies which they subsequently discovered or which independently manifested themselves: (1) the driveway, garage, and north side patio had settled due to improper compaction of the fill material upon which the home was built; (2) the floor framing over the garage had moved, causing gaps between the master bedroom ceiling and fireplace as well as between the floor and interior walls, cracks in the sheetrock walls, and misalignment of interior doors; (3) the floor level of the balcony was approximately one inch higher than the interior floor, causing water to leak into the interior floors and walls; (4) the stone masonry veneer covering portions of the home's exterior walls was improperly installed, allowing water to penetrate behind it, causing the veneer to deteriorate, loosen, and fall off; (5) the downspouts and landscaping were faulty, "resulting in improper drainage of surface water, saturation and settlement of fill material and infiltration of water through and under the foundation walls"; (6) the frames and stops of the home's plate glass windows allowed water to penetrate into the walls and around the glass; (7) the insulation was either improperly installed or not installed at all; and (8) the water pipes were installed "in exterior walls and other loca-

tions subjecting the pipes to freezing temperatures." [2]

The Schafirs assert that the Harrigans, as well as Bennion, knew of many of these defects at the time of sale yet failed to disclose their existence to the Schafirs. The Schafirs base this allegation on a letter the Harrigans wrote to Moyle in December 1985, in which they identified several items in the home that were either never completed satisfactorily during construction or poorly constructed and in need of additional work.[3] The defects mentioned in the Harrigan/Moyle letter, and which the Schafirs emphasize in their brief, are: (1) waterpipes connecting the bottom floor bathroom, laundry room, and kitchen sink were placed one and one-half inches from the outside wall of the house, in violation of Salt Lake building codes;[4] (2) the interior of the garage settled considerably causing a break in the cement all around the perimeter of the garage; (3) the concrete driveway cracked considerably from settling; and (4) the garage doors were out of line due to settling. The Harrigans indicated in this letter that they were trying to sell the house and consequently requested that Moyle take immediate action to correct the problems.[5]

On March 20, 1986, Grant E. Wartena, president of AmDevCo, responded to the Harrigans' letter and offered them $530 to

Wartena, Price, and AmDevCo because they failed to appear at any of the proceedings. Pursuant to Rule 41(a) of the Utah Rules of Civil Procedure, the Schafirs filed, and the court granted, a motion to dismiss with prejudice all claims against defendants Robert G. Wilkinson and The Home Inspector, Inc.

2. As of May 21, 1992, the Schafirs had repaired some of the deficiencies listed in the amended complaint at a total cost of $48,559.33. In addition, the Schafirs had obtained estimates to complete the remaining work that totaled $21,464.56.

3. The Schafirs assert, and Bennion does not dispute, that she received a copy of the Harrigan/Moyle letter, evidenced by a handwritten notation on the letter that states, "bcc:Jodie Bennion."

4. The water pipes froze and burst during the Harrigans' first winter in the home. They had

the pipes repaired and remedied the situation by further insulating the pipes. The Harrigans spent two additional winters in the home without further freezing problems. Additionally, the Schafirs do not claim that the water pipes have frozen during their tenure in the home or that the closeness of the pipes to the home's exterior walls has caused damage of any kind.

5. The Schafirs insist that the Harrigans opted for "cosmetic" solutions to the problems because they were trying to quickly sell the home. However, our review of the Harrigans' letter reveals only that they requested Mr. Moyle to take immediate action to correct the problems because the Harrigans planned to sell the home. We do not agree with the Schafirs that the Harrigans' request for quick action can be equated with a decision to apply "cosmetic" remedies to the problems.

settle their claims against him and AmDev-Co.[6]  The Harrigans agreed to Mr. Wartena's offer and signed a general release.  The Harrigans arranged for Bob Bell, a contractor, to repair the burst water pipe.  Thereafter, the Harrigans spent two more winters in the home without any further problems with freezing pipes.[7]

After the Schafirs purchased the home and discovered its defects, they brought suit against numerous individuals, including Moyle, Bennion, and the Harrigans.  In turn, each of these defendants filed a motion for summary judgment with the trial court.  First, the trial court granted Moyle's motion for summary judgment, ruling that the Schafirs could not recover their economic losses, that the doctrine of caveat emptor applied, and that the trial court would not pierce AmDevCo's corporate veil to hold Moyle personally liable.  Next, the trial court granted Bennion's motion for summary judgment, ruling that there was no genuine issue of material fact as to Bennion's lack of knowledge of defects in the home at the time of the sale to the Schafirs.  As to the Harrigans, the trial court initially denied their summary judgment motion, but allowed for reinstatement at a later time.  Subsequently, the Harrigans moved for, and the trial court granted, a partial summary judgment on the breach of warranty, misrepresentation, and mutual mistake claims.[8]  This appeal followed.

## ISSUES

The Schafirs question the trial court's grant of summary judgment to all three defendants.  First, the Schafirs argue that the trial court improvidently granted Moyle's summary judgment motion because (1) a cause of action for negligence or strict liability supports recovery of economic losses, (2) the doctrine of caveat emptor does not apply

to latent defects or defects known only to the seller, and (3) the question of whether Moyle should be personally liable by piercing the corporate veil presents an unresolved question of fact.  Second, as to Bennion, the Schafirs assert summary judgment was inappropriate because (1) Bennion had a duty to disclose, (2) there are genuine issues of material fact that preclude summary judgment, and (3) the contractual disclaimer provision from the Harrigan/Schafir agreement provides no relief to Bennion.  Finally, the Schafirs insist the trial court erred in granting the Harrigan's partial summary judgment motion because (1) there remain genuine issues of material fact, and (2) the Harrigans were not entitled to judgment as a matter of law on the misrepresentation and breach of warranty claims.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Utah R.Civ.P. 56(c).  Entitlement to summary judgment is a question of law; therefore, we give no deference to the trial court's ruling.  *Higgins v. Salt Lake County,* 855 P.2d 231, 235 (Utah 1993).  Furthermore, because disposition of a case on summary judgment denies the benefit of a trial on the merits, we must review the facts and reasonable inferences therefrom in the light most favorable to the losing party.  *Reeves v. Geigy Pharmaceutical, Inc.,* 764 P.2d 636, 640 (Utah App.1988).

## ANALYSIS

### Claims Against Moyle

1.  Economic Loss Rule

a.  Negligence Theory

■  The Schafirs assert as error the trial court's decision that their losses for repara-

---

**6.**  The $530 consisted of a $500 reimbursement to the Harrigans for their insurance deductible paid to fix the frozen water pipes and $30 for caulking.

**7.**  The record does not disclose what, if any, additional repair work the Harrigans performed be-

yond repairing the burst water pipe and caulking the cracked cement.

**8.**  The remaining claim against the Harrigans for waste was subsequently settled.

tion costs and diminution in value, i.e., economic losses, are not recoverable under a tort theory. To support their position, the Schafirs cite several non-Utah cases that have allowed damages for economic losses in negligence cases.[9] In addition, the Schafirs cite *W.R.H., Inc. v. Economy Builders Supply*, 633 P.2d 42 (Utah 1981) as support for their position that economic losses stemming from negligent construction are recoverable in Utah.

The recent case of *Maack v. Resource Design & Construction, Inc.*, 875 P.2d 570 (Utah App.1994) discussed *W.R.H.* and Utah's economic loss rule. *Maack* held that *W.R.H.* "arguably stands for the proposition that economic losses are recoverable in Utah, *but only in negligent manufacture cases.* As the present case involves alleged negligent construction rather than negligent manufacture, *W.R.H.* is not controlling." *Id.* at 581 (emphasis added); *see also Nastri v. Wood Bros. Homes, Inc.*, 142 Ariz. 439, 690 P.2d 158, 164 (App.1984) (holding economic losses not recoverable under tort theory where damage claimed is to structure itself rather than to personal property or personal injury); *Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 65 Ill.Dec. 411, 413–14, 441 N.E.2d 324, 326–27 (1982) (stating that to recover in negligence there must be showing of harm beyond disappointed expectations and loss of benefit of bargain in purchase of home); *Crowder v. Vandendeale*, 564 S.W.2d 879, 882 (Mo.1978) (noting that recovery for property damage caused by latent structural defects is not actionable in negligence).

The issue of economic losses in *Maack* and the present case is indistinguishable; both involve latent defects caused by allegedly negligent construction of a personal residence and a request for recovery of economic losses. We believe that *Maack* controls the outcome in the present case [10] and therefore hold that the Schafirs cannot recover their economic losses under a theory of negligent construction.

### b. Strict Liability Theory

■ The Schafirs next assert the right to recover their economic losses under a theory of strict liability. The *Maack* court noted that in *Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 158 (Utah 1979), the Utah Supreme Court adopted the doctrine of strict liability as outlined in the Restatement (Second) of Torts § 402A, at 347–48 (1965). *Maack*, 875 P.2d at 581. As that doctrine relates to defective products, it grants recovery to an injured party only if the seller sold the product in a defective condition which was unreasonably dangerous to the purchaser. *Id.*

In the present case, the Schafirs' strict liability claim fails for two reasons. First, the rationale of *Hahn* and *Maack* establishes that Moyle was not a "seller" of the allegedly defective parts or pieces. Rather, he merely utilized the defective components, if any, in building the house. Furthermore, the Schafirs have not shown that the defective components in the house, such as the water pipes and the cracked cement, were sold in a defective condition that was unreasonably dangerous to people occupying the home. Accordingly, the Schafirs cannot recover their economic losses under a strict liability theory.

### 2. Caveat Emptor

■ The Schafirs next argue that the trial court granted Moyle's summary judgment motion on the mistaken notion that caveat emptor applies in this case. Specifically, they assert that caveat emptor does not apply to cases involving latent defects.

The general rule in this state is that the doctrine of caveat emptor still applies to the sale of real estate. The Utah Supreme

---

**9.** *See, e.g., Cosmopolitan Homes, Inc. v. Weller*, 663 P.2d 1041, 1044 (Colo.1983); *Kristek v. Catron*, 7 Kan.App.2d 495, 644 P.2d 480, 483 (1982); *Terlinde v. Neely*, 275 S.C. 395, 271 S.E.2d 768 (1980); *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733, 736 (Wyo.1979).

**10.** *See State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993) (holding that stare decisis applies to subsequent decisions of multi-panel appellate court).

Court has stated that the "doctrine [of caveat emptor] has eroded in the sale of new residential housing. However, the doctrine appears to prevail in the sale of used property whether homes or commercial." *Utah State Medical Ass'n v. Utah State Employees Credit Union*, 655 P.2d 643, 645 (Utah 1982). Additionally, "[o]ne of the reasons for retaining the doctrine of caveat emptor in the area of real estate transactions is the assumption that the vendee has a reasonable opportunity to inspect the premises." *Loveland v. Orem City Corp.*, 746 P.2d 763, 779 (Utah 1987) (Durham, J., concurring and dissenting).

■ The Schafirs' claim that the doctrine of caveat emptor does not apply to a home's latent defects—and thus does not bar suit against the home's builder for defects discovered by a remote purchaser—is really an alternative method of arguing for an implied warranty by the builder of a home for all remote purchasers. As the two arguments are essentially the same, our recent holding in *Maack* controls. In *Maack*, we rejected the idea of an implied warranty between builders and remote purchasers [11] and reaffirmed the general rule that caveat emptor applies to the sale of used residences.[12] *Maack*, 875 P.2d at 583. Accordingly, we affirm the trial court's grant of summary judgment on this issue.

## 3. Piercing the Corporate Veil

■ Finally, the Schafirs assert that the trial court erred by granting Moyle's summary judgment motion because whether the

---

**11.** We noted in *Maack* that Utah recognizes the implied warranty of habitability in the residential landlord tenant area, *see Wade v. Jobe*, 818 P.2d 1006, 1010 (Utah 1991), but declined to extend that rationale to the sale of residential real estate. *See Maack v. Resource Design & Constr., Inc.*, 875 P.2d 570, 583 (Utah App.1994).

**12.** As noted, the Schafirs' argument regarding caveat emptor and latent defects, as it applies to Moyle, is essentially an implied warranty theory, which Utah has not adopted. Additionally, the Schafirs get no further by arguing that caveat emptor is inapplicable to their contract with the Harrigans. Generally, absent some express agreement between the parties—which is absent

circumstances in this case warrant piercing the corporate veil of AmDevCo to hold Moyle responsible for AmDevCo's acts is an unresolved question of fact.

This court has recognized that a corporation and its shareholders are separate and distinct legal entities and has validated the purpose of such a distinction to "insulate the stockholders from the liabilities of the corporation, thus limiting their liability to only the amount that the stockholders voluntarily put at risk." *Salt Lake City Corp. v. James Constr., Inc.*, 761 P.2d 42, 46 (Utah App. 1988). Additionally, we have stated that "[c]ourts must balance piercing and insulating policies and [should] only reluctantly and cautiously pierce the corporate veil." *Id.* To aid courts in deciding when to pierce the corporate veil, the Utah Supreme Court established a two-prong test in *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028 (Utah 1979):

> [I]n order to disregard the corporate entity, there must be a concurrence of two circumstances: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a few individuals; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow.

*Id.* at 1030.

In the present case, the Schafirs argue that AmDevCo was really Moyle's alter ego

---

here—the doctrine of caveat emptor precludes a home buyer from bringing suit for discoverable defects in the home. Especially when the sale of a used home is involved, the purchaser is on notice that the residence is not new and may contain defects affecting the home's quality or condition. *See Utah State Medical Ass'n v. Utah State Employees Credit Union*, 655 P.2d 643, 645 (Utah 1982). In the case of latent defects, a home buyer's best resort against the seller is to sue for either fraudulent or negligent misrepresentation or nondisclosure. The Schafirs have asserted a misrepresentation theory which we address later in this opinion.

through which he personally financed the construction of the Harrigan's home. To rebut the Schafirs' alter ego theory, Moyle supported his summary judgment motion by attaching copies of AmDevCo's articles of incorporation, minutes from board of director's meetings, corporate annual report filed with the State of Utah, and corporate tax returns for 1983 and 1984.[13] We believe that Moyle's evidence satisfactorily demonstrates that AmDevCo observed the requisite corporate formalities and thus distinguished itself as more than Moyle's alter ego. Consequently, AmDevCo fails to meet the first prong of the *Norman* test regarding corporate formalities. Additionally, we believe that the second prong is likewise not satisfied because the trial court's recognition of AmDevCo's corporate form does not "sanction a fraud, promote injustice, or [create] an inequitable result." *Id.* This is particularly true given our resolution of the other claims against Moyle. Accordingly, the trial court did not err by granting summary judgment to Moyle.

### Claims Against Bennion

#### 1. Duty to Disclose Defects

■ The Schafirs assert on appeal that the trial court improperly granted Bennion's summary judgment motion because she had, and failed to fulfill, a duty to disclose to the Schafirs that the water pipes that had burst and been repaired did not conform to the existing building and plumbing codes.

■ The Utah Supreme Court stated in *Dugan v. Jones*, 615 P.2d 1239 (Utah 1980), superseded by statute on other grounds, 846 P.2d 1307 (Utah 1993), that

> [u]nder Utah law, the general rule is no fiduciary obligations exist between a buyer and seller of any property. A real estate agent, however, does not occupy the position of a lay vendor of property. An agent is licensed by the state and is required to

> meet standards of "honesty, integrity, truthfulness, reputation, and competency."

> . . . .

> In this state, it is apparent that the rule of caveat emptor does not apply to those dealing with a licensed real estate agent. Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and is answerable at law for breaches of his or her statutory duty to the public.

*Id.* at 1248; *accord Secor v. Knight*, 716 P.2d 790, 795 (Utah 1986). *Dugan* and *Secor* clearly indicate that Utah real estate agents have an obligation to be honest and truthful in dealing with home buyers. The real estate agent's duty to be honest and truthful would likely include an obligation to disclose to potential buyers any latent or significant patent defects of which the agent is aware. Real estate agents are not, however, home inspectors and should not be required to thoroughly investigate each home they have on the market to discover latent defects. The responsibility to observe patent, and any discoverable latent, defects falls on the buyer of the home and is usually accomplished by hiring a knowledgeable home inspector to scrutinize the home before finalizing a sale. *See Utah State Medical Ass'n v. Utah State Employees Credit Union*, 655 P.2d 643, 645 (Utah 1982). Oftentimes, however, real estate agents and sellers are understandably unaware of latent defects in the home at the time of sale. This is an inherent risk involved in purchasing a home. Thus, the mere fact that the real estate agent has a duty to disclose known defects to potential purchasers does not mean that the agent is liable for all subsequent problems that come to light. The purchasers must also demonstrate that the real estate agent misrepresented, or had prior knowledge of, defects in the home. Only when the purchaser can establish that the agent had both the duty to disclose and knowledge of the defects is recovery appropriate.

---

**13.** AmDevCo was involuntarily dissolved in 1984 by the state of Utah for failure to file its annual corporate report.

In the present case, the Schafirs argue, and we agree, that Bennion had a duty to disclose to the Schafirs any known defects. However, our review of the pleadings and affidavits on file fails to disclose a genuine issue of material fact regarding Bennion's position that she had no knowledge at the time of sale of the alleged latent defect involving the water pipes. It is undisputed that the Harrigans sent Bennion a copy of their letter to Moyle discussing the frozen water pipes. Nonetheless, Bennion avers in her affidavit that the Harrigans later informed her that the frozen-water-pipe problem had been fixed and that the Harrigans thereafter did not discuss with her any further problems with the home. To rebut Bennion's sworn assertions, the Schafirs produce no additional facts or evidence; rather, they point only to apparent inconsistencies between Bennion's deposition and affidavit testimony. The Schafirs claim Bennion asserted in her deposition that the Harrigans would have told her if the problem persisted, while in her affidavit Bennion flatly states that the Harrigans informed her that the problem had been fixed. We believe that this minor inconsistency does not create a genuine issue of fact precluding summary judgment.

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court discussed the level of evidence required by the nonmoving party to avoid summary judgment under the federal rules of civil procedure.

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Id.* at 322–23, 106 S.Ct. at 2552; *accord Reeves v. Geigy Pharmaceutical, Inc.,* 764 P.2d 636, 642 (Utah App.1988).

The Schafirs bear the burden of proof at trial to establish that Bennion had knowledge of, and failed to disclose, the water pipe's alleged nonconformance with the building and plumbing codes. We believe that the Schafirs' failure to rebut Bennion's deposition and affidavit testimony with additional facts or evidence showing that Bennion knew of, yet failed to disclose, the alleged plumbing code violation "fails to make a showing sufficient to establish the existence of an element essential to" the Schafirs' case. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. Accordingly, the trial court appropriately granted summary judgment on this issue.[14]

### Claims Against the Harrigans

#### 1. Breach of Warranty

■ The Schafirs claim the Harrigans breached the warranty contained in the Earnest Money Sales Agreement regarding notice of any building code violations concerning the home.[15]

The doctrine of merger, still viable in Utah,

---

14. Inasmuch as we believe there is no genuine issue of material fact regarding Bennion's knowledge of latent defects in the home, we decline to address the Schafirs' additional argument that the disclaimer provision in the Earnest Money Sales Agreement does not extend relief to Bennion. *See State v. Carter,* 776 P.2d 886, 888 (Utah 1989).

15. Section "C" of the standard Earnest Money Sales Agreement's General Provisions, titled "Seller Warranties," states that "Seller has received no claim nor notice of any building or zoning violation concerning the property which was not or will not be remedied prior to closing."

is applicable when the acts to be performed by the seller in a contract relate only to the delivery of title to the buyer. Execution and delivery of a deed by the seller then usually constitute full performance on his part, and acceptance of the deed by the buyer manifests his acceptance of that performance even though the estate conveyed may differ from that promised in the antecedent agreement. Therefore, in such a case, the deed is the final agreement and all prior terms, whether written or verbal, are extinguished and unenforceable.

*Stubbs v. Hemmert*, 567 P.2d 168, 169 (Utah 1977) (footnotes omitted); *accord Secor v. Knight*, 716 P.2d 790, 793 (Utah 1986); *Embassy Group, Inc. v. Hatch*, 865 P.2d 1366, 1370–71 (Utah App.1993). The merger doctrine has been routinely applied when the antecedent agreement contains an abrogation clause. *Embassy*, 865 P.2d at 1371. The Utah Supreme Court has also recognized that for purposes of an abrogation clause, a deed is equivalent to a final real estate contract. *Espinoza v. Safeco Title Ins. Co.*, 598 P.2d 346, 348 (Utah 1979).

In the present case, the Earnest Money Sales Agreement signed by both parties contains an abrogation clause in section "O" of the general provisions. The clause states that "[e]xecution of a final real estate contract, if any, shall abrogate this Agreement." It is undisputed that the Schafirs accepted a warranty deed for the property.[16] Accordingly, the merger doctrine extinguishes the

Earnest Money Sales Agreement and makes preeminent the warranty deed. Therefore, the Schafirs cannot argue that the Harrigans breached the warranties of section "C" in the Earnest Money Sales Agreement unless that warranty, or another similar one, is contained in the warranty deed or, by its terms, survives the delivery and acceptance of the warranty deed. Section 57–1–12 of the Utah Code lists the specific warranties given when property is conveyed by a warranty deed.[17] Those warranties do not include notice of building code violations. Hence, the merger doctrine precludes the Schafirs from arguing that the Harrigans breached a warranty contained in the Earnest Money Sales Agreement. Therefore, we affirm the trial court's grant of summary judgment on this point.

### 2. Misrepresentation

■ The Schafirs maintain that the trial court erred by granting the Harrigans' summary judgment motion relating to the Schafirs' claim of misrepresentation because there are genuine issues of material fact. The Schafirs essentially dispute the trial court's ruling that the issue of the water pipes' conformance to building and plumbing codes at the time of sale was neither genuine nor material and that the Harrigans made no actionable misrepresentation.

As mentioned above, the Supreme Court in *Celotex* stated that summary judgment should be entered against a party who fails to make a showing sufficient to establish the

---

16. Although the Schafirs were the purchasers and occupiers of the home, the deed for the home went first from the Harrigans to Spencer R. and Roberta M. Kaitz, business associates of Dr. Schafir. The Kaitzes then deeded the property to Dr. Schafir in exchange for Dr. Schafir's interest in some California property. Dr. Schafir then executed a quitclaim deed vesting title to the home in himself and his wife as tenants in common. The Schafirs apparently pursued this three-way transaction in order to take advantage of the like-kind exchange rules found in § 1031 of the Internal Revenue Code. *See* 26 U.S.C. § 1031 (1988). The Harrigans argued below that this arrangement effectively precluded the Schafirs from raising any claims against them arising under the contract and requiring privity because the Harrigans actually sold the home to

the Kaitzes rather than the Schafirs. The trial court did not adopt the Harrigans' reasoning and instead allowed the Schafirs' contract claims against the Harrigans to proceed.

17. The warranties are:

[1] that [the seller] is lawfully seised of the premises; [2] that [the seller] has good right to convey the same; [3] that [the seller] guarantees the grantee, his heirs and assigns in the quiet possession thereof; [4] that the premises are free from all encumbrances; and [5] that the grantor, his heirs and personal representatives will forever warrant and defend the title thereof in the grantee, his heirs and assigns against all lawful claims whatsoever.

Utah Code Ann. § 57–1–12 (1993).

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, because the complete failure of proof on an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

A cause of action for misrepresentation contains numerous elements. Chief among them, however, is the requirement that one party misrepresent a material fact to the other party. *See Price–Orem Inv. Co. v. Rollins, Brown & Gunnel, Inc.*, 713 P.2d 55, 59 (Utah 1986). In addition, the party claiming injury must demonstrate that its injury resulted from reasonable reliance on the other party's misrepresentation. *Id.*

The trial court ruled, as a matter of law, that the Harrigans made no actionable representation. We agree. It is undisputed that the Harrigans knew at the time of sale that the pipes had been repaired and that they had been informed, based upon their contractor's research of the Uniform Plumbing Code (UPC), that the water pipes conformed to the UPC, despite the distance between the pipes and the exterior walls. Moreover, the undisputed facts show that the Harrigans repaired the ruptured water pipes and lived in the house for two additional winters without further freezing or bursting problems before selling the home to the Schafirs and that the Schafirs have not claimed any damage from frozen or burst water pipes. Accordingly, we affirm the trial court's grant of summary judgment on this issue because the Schafirs have failed to make a showing sufficient to establish the existence of an element essential to their case, and on which they would bear the burden of proof at trial.[18]

### 3. Attorney Fees

■ The Harrigans cross-appeal from the trial court's denial of their motion for

---

18. We also disagree with the Schafirs' claim that genuine issues of material fact still exist regarding the plumbing code violation. The Harrigans supported their summary judgment motion with affidavits from Bob Bell, the handyman who remedied the frozen water pipes, Dee Chilinski, a certified building inspector, Bennion, and Mr. Harrigan. Each affidavit supports the Harrigans' position that they believed the water pipes conformed to applicable building and plumbing codes at the time they sold the home to the Schafirs. Mr. Chilinski states that he reviewed the Salt Lake County compliance Inspection Reports prepared in connection with the construction of the Harrigans' home. That report reveals that periodic inspections were made of the home during construction and that "[a]t no time during the construction of the subject property was the plumbing, particularly the water pipes placed in the exterior walls, found to be in violation of City Codes." Further, Mr. Chilinski states that he is familiar with both the Uniform Plumbing Code (UPC) and the Uniform Building Code (UBC) and that "placement of water pipes in exterior walls does not, in and of itself, constitute a violation of the [UPC]."

Mr. Bell's affidavit is consistent with Mr. Chilinski's statements. Although Mr. Bell initially informed the Harrigans that the placement of the water pipes in exterior walls was likely a violation of the UPC, he states that he subsequently researched the UPC and discovered that "the placement of water pipes in exterior walls did not, in and of itself, constitute a violation of the Plumbing Code."

To rebut the Harrigans' summary judgment motion and supporting affidavits, the Schafirs supplied the affidavit of Dean Webb, a civil engineer licensed in Utah. Mr. Webb stated that he is familiar with the "uniform codes that apply to building construction in the state of Utah," based on his education and extensive experience in the construction industry. He maintains that he made several on-site inspections of the Schafirs' home between October 1987 and February 1988 and found several aspects of the home's construction to be in violation of the uniform building codes. Specifically, he states that "the water pipes serving several portions of the home were installed in exterior walls in violation of section 315(f) of the UPC."

In addition to Mr. Webb's affidavit, the Schafirs attempt to raise issues of fact by pointing to apparent inconsistencies between the Harrigans' early position, as evidenced by their letter to Moyle, that the water pipes violated the UPC and could not be brought into compliance without moving them at least six inches from the exterior walls, and their later position insisting that the water pipes, despite not being moved, had been brought into compliance with the UPC.

While there may be a genuine issue as to whether water pipes placed in exterior walls are a technical violation of the UPC, the issue is not material in the present case. The Schafirs presented no evidence to rebut the Harrigans' contention that they had no knowledge of a continuing defect in the home after they completed repairs of the ruptured pipes and then lived in the house for two years with no pipe freezing or bursting problems.

attorney fees. The Earnest Money Sales Agreement provided for payment of reasonable attorney fees to the non-defaulting party. Using this provision as a springboard, the Harrigans requested attorney fees under Utah Code Ann. § 78–27–56.5 (1992).[19]

In Utah, the "[c]alculation of reasonable attorney fees is in the sound discretion of the trial court and will not be overturned in the absence of a showing of a clear abuse of discretion." *Dixie State Bank v. Bracken,* 764 P.2d 985, 988 (Utah 1988) (citation omitted). In this case, the trial court denied the Harrigans' motion for attorney fees because only one of the Schafirs' claims stemmed from the contract and "any fees or costs uniquely applicable to the [contractual] warranty claim are insignificant." Although the trial court could have attempted to allocate a portion of the fees to the contractual warranty claim, it decided against such action because "[i]t would not be appropriate." We believe that the trial court is in the best position to determine how much of the attorney's time was spent on each of the four issues. In addition, we think that the trial court should determine whether an allocation of fees is appropriate under the circumstances. In this case, the trial court felt it was inappropriate and we defer to its deci-sion because there is no clear abuse of discretion. Therefore, we affirm the trial court's denial of the Harrigans' motion to award attorney fees.

## CONCLUSION

We affirm the trial court's grant of summary judgment in favor of the defendants who are parties to this appeal and against the Schafirs. The Schafirs have failed to demonstrate that there exist any genuine issues of material fact that would preclude a grant of summary judgment. In addition, we affirm the trial court's denial of attorney fees to the Harrigans.

DAVIS and JACKSON, JJ., concur.

19.  Section 78–27–56.5 states:
     A court may award costs and attorney's fees to either party that prevails in a civil action based upon any promissory note, written contract, or other writing executed after April 28, 1986, when the provisions of the promissory note, written contract, or other writing allow at least one party to recover attorney's fees.
     Utah Code Ann. § 78–27–56.5 (1992).