AMERICAN TOWERS OWNERS ASSO-
CIATION, INC., a Utah corporation,
Plaintiff and Appellant,

v.

CCI MECHANICAL, INC., Christiansen
Brothers, Inc., American Towers, Inc.,
Trossen Wright Architects, P.A., Donald
A. Wright, Duane A. Trossen, Block 58
Associates, a limited partnership, Block
Associates, Inc., Dee W. Christiansen,
West Temple Associates, a limited part-
nership, CL Management Ltd., a limited
partnership, Howard S. Clark, Estate of
George A. Leaming, MB Management,
Inc., Daw Incorporated, Hunter Insula-
tion, Inc., First Security Bank of Utah,
N.A., REH Incorporated, MCC Powers
Process Controls, and Red–White Valve
Corp., Defendants and Appellees.

No. 950136.

Supreme Court of Utah.

Dec. 20, 1996.

Craig G. Adamson, Eric P. Lee, Cameron S. Denning, Salt Lake City, for American Towers Owners Association.

John L. Young, Salt Lake City, for CCI Mechanical.

George A. Hunt, Kurt M. Frankenburg, Reed L. Martineau, John R. Lund, Julianne Blanch, Salt Lake City, for Christiansen Brothers, Block 58 Associates, Dee W. Christiansen.

Raymond Scott Berry, Salt Lake City, for American Towers, Inc.

Karra J. Porter, Geoffrey C. Haslam, Salt Lake City, for Trossen Wright Architects, Duane Trossen, Donald Wright.

Terry M. Plant, Bradley R. Helsten, Salt Lake City, for West Temple Associates, Howard Clark, CL Management Ltd., Estate of George Leaming, MB Management.

Tim Dalton Dunn, J. Rand Hirschi, Salt Lake City, for Daw Incorporated.

Merrill F. Nelson, Gregory M. Simonsen, Salt Lake City, for Hunter Insulation, Red–White Valve Corp.

Jonathan A. Dibble, Keith A. Kelly, Salt Lake City, for First Security Bank, REH Incorporated.

Harold L. Petersen, Salt Lake City, for MCC Powers Process Controls, Mark Controls Corporation.

Craig C. Coburn, Bret M. Hanna, Salt Lake City, for amicus Consulting Engineers Council, amicus Utah Society of American Institute of Architects.

HOWE, Justice:

Plaintiff American Towers Owners Association, Inc. (the Association), brought this action against numerous defendants, alleging design and construction defects in the plumbing and mechanical systems of a large condominium complex. The district court granted defendants' motions for summary judgment, and the Association appeals.

## BACKGROUND

In reviewing this grant of summary judgment, we view the facts in the light most favorable to the Association and recite them accordingly. The American Towers complex consists of two 26–story towers containing 357 residential units and some commercial space. Architectural services for the complex commenced in 1980, and a general contractor was hired in 1981. The complex was substantially completed in July 1983.

Defendants were all involved in the complex's design, development, and construction. CCI Mechanical, Inc. (CCI), was the complex's mechanical subcontractor and engineer and was responsible for the planning and installation of the culinary water, sewer, heating, cooling, and fire protection systems. Christiansen Brothers, Inc., was the general contractor. American Towers, Inc., was the original developer and was one of the original borrowers on the complex's construction loan. Trossen Wright Architects, P.A., Donald A. Wright, and Duane A. Trossen were the architects. Block 58 Associates, Block Associates, Inc., Dee W. Christiansen, West Temple Associates, CL Management, Ltd., Howard S. Clark, the late George A. Leaming, and MB Management, Inc., were all involved in the development and/or financing of the complex.[1] Daw Incorporated was the dry wall subcontractor. Hunter Insulation, Inc., was the insulation subcontractor. First Security Bank of Utah, N.A., and its wholly owned subsidiary REH Inc., foreclosed its security interest in 1984 and became a successor developer of the complex.[2]

The Association's second amended complaint[3] sought damages for unjust enrichment, breach of contract/warranty (third-party beneficiary), negligence, and breach of implied warranty.[4] The allegations generally concern problems with the complex's plumbing and mechanical systems. For example, instead of using premanufactured T-shaped joints at the ninety degree plumbing connections, builders fabricated the joints on site. These joints were allegedly incorrectly made, resulting in thin walls that are inherently weaker than standard premanufactured joints. These weak joints began to progressively spring leaks in late 1990 as the complex reached full occupancy. Other problems include (1) piping systems that were installed without adequate provision for expansion and contraction and without sufficient guides and anchors, resulting in pipe breaks and leaks, (2) pipes that are too small in some locations, resulting in pressure loss and failures, (3) domestic water system pressure that exceeds the code limit at some fixtures, and (4) lack of outside air vents and exhaust systems.

First Security filed a motion to dismiss the complaint which the district court treated as

---

1. The parties share multiple intersecting business relationships. For example, Dee W. Christiansen was the president of American Towers, Inc., a general partner in Block 58 Associates, and a vice president of Christiansen Brothers, Inc. West Temple Associates, on the other hand, was a limited partner in Block 58 Associates and a shareholder in Block Associates, Inc.

2. Defendants Red–White Valve Corp. and MCC Powers Process Controls, also called Mark Controls Corp., have been dismissed from this action.

3. In September 1991, the Association filed a complaint against CCI Mechanical, Inc. In June 1992, the Association filed an amended complaint, clarifying the original complaint and adding a breach of warranty claim. In July 1993, the Association filed a second amended complaint, adding the nineteen other defendants and a products liability claim.

4. The complaint also asserted claims of conversion and products liability. The Association did not pursue the conversion claim before the district court and does not do so on appeal. The products liability claim applied only to MCC Powers Process Controls, which was dismissed from this action.

a motion for summary judgment. The court granted the motion, concluding that First Security entered into a May 1989 release with the Association that covered the claims asserted in the complaint and that the release was not subject to rescission on the basis of mutual mistake.

Most of the remaining defendants moved for summary judgment beginning in May 1994. In response, the Association moved for a continuance under rule 56(f) of the Utah Rules of Civil Procedure, on which motion the court apparently did not rule. In July 1994, the Association filed a second rule 56(f) motion.

The district court conducted a hearing in August 1994, denied the Association's rule 56(f) motion, and granted all of the summary judgment motions, concluding that (1) the unjust enrichment claim fails because the subject matter of the claim was preempted by the existence of express contracts and because the Association conferred no benefit upon defendants, (2) the third-party beneficiary claim fails because the Association was not an intended beneficiary, (3) the negligence claim fails because the alleged damages are for economic loss, not for injury to persons or other property, (4) the implied warranty of habitability claim fails because Utah does not recognize such a claim in this circumstance, (5) all of the Association's claims accrued more than six years prior to the commencement of this action and are time-barred, and (6) the discovery rule does not apply to toll the running of the statute of limitations.[5]

Following the court's decision, Hunter Insulation, Inc., and American Towers, Inc., moved for summary judgment. The court granted the motions on the same basis as the prior motions.

The sole remaining defendant, Block Associates, Inc., did not respond to the second amended complaint. Consequently, the Association moved for entry of default judgment. The district court directed entry of Block Associates' default but denied the request for a money judgment, holding that granting one would be inconsistent with the court's prior holdings in the case.

On review of a grant of summary judgment, we will affirm only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Andreini v. Hultgren,* 860 P.2d 916, 918 (Utah 1993).

### FIRST SECURITY & REH

We first address the district court's grant of summary judgment to First Security and its wholly owned subsidiary REH (collectively, "First Security") on a basis unique from the other defendants. The court held that (1) First Security entered into a release with the Association that covered the claims asserted in the complaint, and (2) the release is not subject to rescission on the basis of mutual mistake. These are questions of law that we will review for correctness.

In 1983, First Security provided financing for the complex under a participation agreement with American Savings, the original lender on American Towers. In 1984, First Security foreclosed its security interest and took ownership of American Towers. In 1987, the Association sued First Security, claiming that it owed unpaid assessments on the units it owned. In addition, some owners in the complex who were also members of the association filed another action against First Security.

---

5. The court also held that the claims against West Temple Associates, Howard S. Clark, Estate of George A. Leaming, CL Management, Ltd., and MB Management, Inc. (collectively, the West Temple defendants),

> fail as a matter of law due to the fact that the West Temple defendants were not the actual owners or developers of the American Towers project, but were either shareholders or limited partners in the entities that did own and/or develop the project. By virtue of the protection afforded shareholders by the principles associated with the corporate veil or by opera-

tion of the Utah Revised Uniform Limited Partnership Act, the West Temple defendants have no liability for the various claims of the plaintiff.

On this appeal, the Association has not addressed any issue raised by this holding except as it may relate generally to whether the district court erred in denying the Association's rule 56(f) motion for continuance, discussed below. Issues not briefed by an appellant are deemed waived and abandoned. *Pixton v. State Farm Mut. Auto. Ins. Co.,* 809 P.2d 746, 751 (Utah.Ct.App.1991).

██ In May 1989, the Association and First Security entered into a "Settlement Agreement and Mutual Release of Claims" (the Release). The Release states that First Security denied liability for the past due assessments and had its own claims and off-sets against the Association. The Release also provides:

WHEREAS, the Association did not assert other claims in [its action], but is willing to release *all other claims* against Lenders it may have *which arise out of or relate to the acquisition, foreclosure, man-agement, control, supervision or owner-ship by Lenders of the American Towers project from its inception to the present.*

....

2. The Association, by authority of its Board of Trustees and exercising all of the powers of the Association vested in it by law, the Articles of Incorporation, By-Laws, and Declaration of Condominium, does hereby release, acquit, and forever discharge Lenders and their respective agents, employees, affiliates, successors and assigns from all claims asserted in and arising out of [the action], ... *and from all other claims, actions, causes of action, and/or damages against Lenders which arise out of or relate to the acquisition, foreclosure, management, supervision, operation or control by Lenders.*

(Emphasis added.) Under the Release, First Security and American Savings paid $100,000 to the Association, $51,807.20 of which was provided by First Security. The parties to the Release verified that they had consulted with legal counsel and were authorized to enter into the agreement.

The district court found that in consideration of the Release, First Security "paid significant consideration, gave up valuable counterclaims, and provided a release of claims against the Association." The court concluded that the Release was unambiguous, was fully enforceable, and covered the claims made in the Association's complaint.

The Association points out that the release lacks an "all-inclusive phrase such as 'all claims of any nature' " and does not mention "First Security's involvement in the construction and marketing of the project." Thus, the Association contends that the Release does not encompass the claims the Association now asserts against First Security. We disagree.

The agreement broadly releases *"all* other claims, actions, causes of action, and/or damages against Lenders which arise out of or relate to the acquisition, foreclosure, management, supervision, operation or control by Lenders." (Emphasis added.) The Association's brief asserts:

When First Security took title to the project its role as construction lender ceased and it became the successor owner/developer. First Security then completed construction and sold or leased its property. These are the activities which give rise to the present claims against First Security.

The Association's claims in this case "arise out of or relate to [First Security's] acquisition, foreclosure, management, supervision, operation or control" of the complex. More specifically, First Security's role in coordinating the completion of the construction and marketing of the units for sale "arose out of" and "related to" its roles in managing, supervising, and operating the complex. We conclude that the Release unambiguously applies to the Association's claims against First Security.

██ The Association argues that mutual mistake allows it to avoid the Release even if the Release covers First Security's potential liability for the construction deficiencies. The district court rejected this argument, concluding that due to "a sustained level of expense for mechanical and plumbing repairs for several years prior to 1989 ... the problems with the American Towers buildings after 1989 were at most the 'unknown consequences of a known injury.' " Furthermore, the court found that there was no evidence that the parties were mistaken about any fact at the time they entered into the Release.[6] We agree.

---

**6.** As further evidence that there was not a mutual mistake of fact, the court found that an individual who had worked on the complex as a First Security employee later became the Association's manager, providing the Association with knowledge of First Security's role in the complex's

In *Carter v. Kingsford,* 557 P.2d 1005 (Utah 1976), the plaintiff suffered a neck injury resulting from a car accident. She signed a general release for $3,334.09. "[S]he was aware of the injury, believing it was merely a severe neck strain, but was unaware of the nature or extent of her injury." *Id.* at 1006. After signing the release, she developed numbness in her arm and eventually required neck surgery. She then sued, seeking to avoid her release. This court distinguished between " 'an unknown injury and the unknown consequences of a known injury' where 'the former can be the basis of a mutual mistake, while the latter would be only a mistake of opinion.' " *Id.* (quoting *Reynolds v. Merrill,* 23 Utah 2d 155, 460 P.2d 323 (1969)). The court concluded that the release barred the action because the complications constituted "an unknown consequence of a known injury." *Id.*

The Association asserts that because the damages now claimed were "unknown at the time of the release, the parties could not have intended the release to cover the damage." The record indicates that from 1985 through 1990, the Association incurred average annual expenses of approximately $3,100 for repairs to the complex's mechanical and plumbing systems. While repair costs later jumped significantly,[7] presumably the Association could have sued First Security for alleged defects leading to then-completed repairs. The Release indicates that in consideration of First Security's payment, the Association "did not assert other claims" that it had against First Security and released First Security from liability for all of the various roles it had played in financing and developing the complex.

A party may not rely upon mistake to avoid an agreement when "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." Restatement (Second) of Contracts § 154(b) (1981). Simi-

larly, "[t]his Court will not nullify a settlement contract because one of the parties would have acted differently if all the future outcomes had been known at the time of the agreement." *Blackhurst v. Transamerica Ins. Co.,* 699 P.2d 688, 692 (Utah 1985).

Because the Association had a sustained level of plumbing and mechanical problems prior to 1989, we cannot say that the problems now claimed were "unknown" when the parties signed the broad release. The Release clearly demonstrates the Association's intent to hold First Security blameless for its activities related to the complex. This is especially true in this setting, where complex claims were negotiated between parties sophisticated in commercial transactions. *Cf. In re Dow Co. Sarabond Prod. Liab. Litig.,* 660 F.Supp. 270, 275 (D.Colo.1987) (noting that personal injury cases are more susceptible to being set aside). We conclude that the district court correctly granted summary judgment to First Security.

## THIRD–PARTY BENEFICIARY

■ The district court held that the Association's "breach of contract/warranty claim fails as a matter of law because plaintiff had no privity with the contracting parties and was not an intended beneficiary of any of the contracts alleged." The Association admits that it was not a direct party to any of the construction contracts with defendants and that there was no express language in the contracts establishing an intent to confer a special benefit on the Association.[8] Instead it argues that its status as a third-party beneficiary is a question of fact because all the parties to the contracts "understood [that] the true beneficiaries of the contract performances would be the ultimate owners of the condominium units" and because "[t]he true intent of the parties may not be as professed in the contract."

---

acquisition and foreclosure. However, we find it unnecessary to discuss this holding.

7. The Association's 1991 repair bill was over $22,000 and its 1992 repair bill was over $44,000. These increases are attributable, at least in

part, to the complex's increase in unit ownership approaching full occupancy.

8. In the general contractor contract, no such provision is present. In the subcontracts, third-party beneficiary status is expressly denied.

Whether a third-party beneficiary status exists is determined by examining a written contract. The issue can be decided on summary judgment as a question of law, and this court has frequently affirmed those legal determinations on review for correctness. *See, e.g., Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist,* 773 P.2d 1382, 1385–86 (Utah 1989); *Wasatch Bank v. Surety Ins. Co.,* 703 P.2d 298, 300 (Utah 1985).

The trial court correctly determined that the claim must fail as a matter of law. To have enforceable rights under the construction contracts, the Association had to establish that it was an *intended* beneficiary of one or more of those contracts. *Ron Case Roofing,* 773 P.2d at 1386. "The intent of the contracting parties to confer a separate and distinct benefit must be clear." *Id.* "A third party who benefits only incidentally from the performance of a contract has no right to recover under that contract." *Broadwater v. Old Republic Sur.,* 854 P.2d 527, 537 (Utah 1993). The Association failed to meet its burden of establishing the requisite intent.

Utah courts have not specifically addressed whether a subsequent condominium purchaser or owners association can assert a third-party beneficiary claim against the general contractor and its subcontractors under their construction contracts. However, courts that have examined this issue have denied third-party beneficiary status.

In *Lake Placid Club v. Elizabethtown Builders, Inc.,* 131 A.D.2d 159, 521 N.Y.S.2d 165 (1987), a condominium owners association brought suit against the builder and the architect of the condominiums for breach of contract and negligence. After noting that the plaintiff had failed to submit any language from the contract demonstrating an intent to confer rights of performance on the ultimate owners of the units, the court stated:

> Indeed, there is nothing whatsoever in the record to suggest that the developer had in mind anything but the normal business motive to obtain a construction product of sufficient quality for ready marketability of the condominium units to potential customers. *Such a motive is clearly not a basis from which to infer the requisite intent of the developer to bestow performance benefits upon the purchasers of the condominium units, let alone their successors.*

*Id.* 521 N.Y.S.2d at 166 (emphasis added).

Likewise, in *155 Harbor Drive Condominium Ass'n v. Harbor Point, Inc.,* 209 Ill. App.3d 631, 154 Ill.Dec. 365, 568 N.E.2d 365 (1991), the court affirmed the dismissal of the plaintiff association's third-party beneficiary claim, stating:

> With respect to construction contracts ... "[i]t is not enough that the parties to the contract know, expect or even intend that others will benefit from the construction of the building in that they will be users of it. The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear."
>
> . . . .
>
> There is no question that the parties were aware that the building was being built for subsequent purchasers. However, "[i]t is not enough that the parties know, expect or even intend that" such people may benefit or that they are referred to in the contract.

*Id.* 154 Ill.Dec. at 374–75, 568 N.E.2d at 374–75 (quoting *Waterford Condominium v. Dunbar Corp.,* 104 Ill.App.3d 371, 60 Ill.Dec. 110, 432 N.E.2d 1009 (1982)).

We conclude that the district court properly granted summary judgment on the third-party beneficiary claim against defendants.

## ECONOMIC LOSS

■ The Association's complaint also alleges that defendants negligently failed "to design, construct, supervise and/or inspect the construction, and/or supply materials for the construction of the Property." As a result, the Association alleges that it incurred "substantial and ongoing reparation costs, the substantial diminution of the value of the Property and other special and consequential damages to be proven at trial." The district court held that this claim "fails as a matter of law because the alleged damages are for economic loss, not for injury to persons or

other property." The Association contends that the court erred in its holding and encourages us to overturn two court of appeals opinions, *Maack v. Resource Design & Construction, Inc.*, 875 P.2d 570 (Utah.Ct.App. 1994), and *Schafir v. Harrigan*, 879 P.2d 1384 (Utah.Ct.App.1994), "to the extent they bar tort claims for the recovery of foreseeable economic losses in this context." Because these are questions of law, we do not grant the district court's ruling any deference. *Higgins v. Salt Lake County*, 855 P.2d 231, 235 (Utah 1993).

In *Maack*, the court of appeals explained:

> The "economic loss rule" is the majority position that one may not recover "economic" losses under a theory of non-intentional tort. *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866–75, 106 S.Ct. 2295, 2300–04, 90 L.Ed.2d 865 (1986); *accord Lempke v. Dagenais*, 130 N.H. 782, 547 A.2d 290, 296 (1988) ("It is clear that the majority of courts do not allow economic loss recovery in tort, but that economic loss is recoverable in contract."). Economic loss is defined as:

> > "[D]amages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property ... as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'"

*Maack*, 875 P.2d at 579–80 (quoting *2314 Lincoln Park W. Condominium v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill.2d 302, 144 Ill.Dec. 227, 229, 555 N.E.2d 346, 348 (1990) (other citations omitted)). In other words, economic damages are not recoverable in negligence absent physical property damage or bodily injury. *Sandarac Ass'n v. W.R.*

*Frizzell Architects, Inc.*, 609 So.2d 1349, 1352 (Fla.Dist.Ct.App.1992).

In *Maack*, a builder sold a home to a buyer. Soon thereafter, the buyer resold the home to a second buyer. When the home developed water leaks, the second buyer sued the home builder for negligent design and construction. 875 P.2d at 573. The court of appeals upheld the trial court's grant of summary judgment for the home builder, noting the "intrinsic differences between tort and contract law." *Id.* at 580. The court concluded that recovery for deficiencies in the *quality* of construction " 'must be defined by reference to that which the parties have agreed upon.' " *Id.* (quoting *Crowder v. Vandendeale*, 564 S.W.2d 879, 882 (Mo. 1978)). Under similar facts in *Schafir*, 879 P.2d at 1388, the court of appeals again held that a plaintiff "cannot recover ... economic losses under a theory of negligent construction."

The Association argues that these court of appeals decisions conflict with this court's plurality opinion in *W.R.H., Inc. v. Economy Builders Supply*, 633 P.2d 42 (Utah 1981).[9] In that case, a purchaser of plywood siding sued the manufacturer when the siding delaminated following installation. The plaintiff alleged that the "negligent manufacture" of the siding resulted in damages to him. *Id.* at 43. The lead opinion determined that the plaintiff had stated a cause of action: "[T]he statement that 'purely economic interests are not entitled to protection against mere negligence' ... is inapplicable *in situations such as the present* where the alleged *defective manufacture* results in the deterioration of the product." *Id.* at 44 (emphasis added).

*W.R.H.* has not been followed in subsequent cases. Instead, it has been distinguished as a case that addressed only the negligent manufacturing of a product. *See Paul Mueller Co. v. Cache Valley Dairy Ass'n*, 657 P.2d 1279, 1286 (Utah 1982) (limiting *W.R.H.* to negligent manufacturing of product);[10] *Maack*, 875 P.2d at 581 (*W.R.H.*

---

9. Justice Maughan wrote the lead opinion, in which Justice Wilkins concurred. Justices Stewart and Crockett concurred in the result only. Justice Hall dissented from that portion of the lead opinion dealing with recovery for negligence.

10. Justice Hall, who dissented in *W.R.H.* on the ground that purely economic interests are not recoverable in tort, authored the unanimous opinion in *Paul Mueller Co.* in which he concluded that two subcontractors were not liable in tort for negligently manufacturing and installing

"not controlling" because it involved "negligent manufacture" of product rather than "negligent construction" of building); *Schafir*, 879 P.2d at 1388 (same); *see also Perry v. Pioneer Wholesale Supply Co.*, 681 P.2d 214, 217–18 n. 3 (Utah 1984) (this court has never blended tort and contract concepts to allow products liability for purely economic injuries). Here, the Association alleges negligent design and construction of improvements to real property, not the negligent manufacturing of a product. Thus we conclude that *W.R.H.* does not apply to this case.

The policy reasons supporting the economic loss rule are sound. When a product does not perform or last as long as the consumer thinks it should, the claim pertains to the quality of the product as measured by the buyer's and user's expectations—expectations which emanate solely from the purchase transaction. Thus, contract principles resolve issues when the product does not meet the user's expectations, while tort principles resolve issues when the product is unsafe to person or property.[11]

The Association argues that applying the economic loss rule in construction cases rewards builders who construct defective housing and wrongly focuses on the consequences of the defective activity instead of on the activity itself. We disagree. Builders who construct low quality housing that does not cause injury to persons or property may still be held liable for damages, but that liability should be defined by the contract between the parties. The law of torts imposes no standards on the parties' performance of the contract; the only standards are those agreed upon by the parties. Tort law is concerned only with the *safety* of a product or an action. *See Maack*, 875 P.2d at 580; *Seely v. White Motor Co.*, 63 Cal.2d 9, 45

Cal.Rptr. 17, 23, 403 P.2d 145, 151 (1965). Otherwise, the extension of tort law would result in "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 444 (1931); *see also East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 871, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865, 876–77 (1986) (noting need to keep products liability and contract law in separate spheres and to maintain realistic limitation on damages).

These rationales are particularly applicable to claims of negligent construction. Construction projects are characterized by detailed and comprehensive contracts that form the foundation of the industry's operations. Contracting parties are free to adjust their respective obligations to satisfy their mutual expectations. *See* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 92, at 659 n.15 (5th ed. 1984) ("[G]enerally ... a contractor's liability for economic loss is fixed by the terms of his contract."). For example, a developer can contract for low-grade materials that meet only minimum requirements of the building code. When the developer sells those units, a buyer should not be able to turn around and sue the builder for the poor quality of construction. Presumably the buyer received what he paid for or he can bring a contract claim against his seller. *See* Keeton, § 101, at 708 (nondangerous product "cannot be so poor in quality as to be unworthy of sale if the price is right"). Meanwhile, if the developer has a problem with the builder, he too will have a contract remedy. A buyer can avoid economic loss resulting from defective construction by obtaining a thorough inspection of the property prior to purchase and then by either obtaining insurance or by negotiating a warranty or reduction in price to reflect the

---

dairy equipment. 657 P.2d at 1286; *see also Salt Lake City Corp. v. Kasler Corp.*, 855 F.Supp. 1560, 1570 (D.Utah 1994) (noting that *Paul Mueller Co.* "strictly limited the holding in *W.R.H.* to its particular facts").

**11.** A plaintiff may, however, recover purely economic losses in cases involving *intentional* torts,

e.g., fraud, business disparagement, intentional interference with contract, etc. *See* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 101, at 708 (5th ed. 1984) ("Historically ... the only tort action available to a disappointed purchaser suffering intangible commercial loss has been the tort action of deceit for fraud....").

risk of any hidden defects.[12] *See Casa Clara Condominium Ass'n v. Charley Toppino & Sons, Inc.,* 620 So.2d 1244, 1247 (Fla.1993).

■ Next, the Association contends that the economic loss doctrine should not apply because it suffered damages to property other than the product itself. *Maack* defined economic loss as " '[d]amages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—*without any claim of* personal injury or *damage to other property.*' " 875 P.2d at 580 (emphasis added) (citations omitted). The Association alleges that as a result of the leaking pipes, its members suffered damage to walls, wall coverings, carpeting, wall hangings, curtains, and other furnishings.

This argument fails because in this case the "property" was the entire complex itself that was constructed as an integrated unit under one general contract. In *Casa Clara Condominium Ass'n,* 620 So.2d at 1244, a condominium owners association brought a negligence claim against a concrete supplier for damages to repair defective concrete. After explaining the distinction between tort recoveries for physical injuries and contract/warranty recovery for economic loss, the court addressed the owners' argument that the concrete had damaged "other" property. The court rejected the argument, stating:

> These homeowners bought finished products—dwellings—not the individual components of those dwellings. They bargained for the finished products, not their various components. The concrete became an integral part of the finished product and, thus, did not injure "other" property.

*Id.* at 1247.

Similarly, in *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55 (1988), homeowners filed a negligence action against their architects and builders after their swimming pool settled, causing damage to the pool, the water lines, and the home's foundation. The court concluded that the claim was barred by the economic loss rule:

> The plaintiffs here allege nothing more than disappointed economic expectations. They contracted with a builder for the purchase of a package. The package included land, design services, and construction of a dwelling. The package also included a foundation for the dwelling, a pool, and a pool enclosure. The package is alleged to have been defective—one or more of its component parts was sufficiently substandard as to cause damage to other parts. The effect of the failure of the substandard parts to meet the bargained-for level of quality was to cause a diminution in the value of the whole, measured by the cost of repair. This is a purely economic loss, for which the law of contracts provides the sole remedy.

*Id.* 374 S.E.2d at 58.

These cases are applicable here. The Association contends that the complex's plumbing and mechanical systems do not meet their expectations, resulting in a diminution in value of their purchase measured by the cost of repair. This deterioration of the complex does not qualify for the "damage to other property" exception to the economic loss doctrine. *See East River Steamship,* 476 U.S. at 870–71, 106 S.Ct. at 2302 (economic loss doctrine bars claim that negligently designed and manufactured turbines malfunctioned and damaged themselves, resulting in repair costs and loss of income). This interpretation is consistent with the court of appeals' decisions applying the economic loss rule in *Maack,* 875 P.2d at 573, and *Schafir,* 879 P.2d at 1386, where the plaintiffs claimed that construction defects caused water leakage into other parts of their homes.

The Association further contends that the economic loss rule should not apply to design professionals, although it fails to explain why this group is distinguishable from construction defendants.[13] The plaintiff in *Maack*

---

12. The condominium buyer may inspect the common areas and mechanical services of the complex by contacting the owners association whose duty is to maintain and operate those areas and services.

13. Although defendants argue that this issue was not raised below and has been waived, we find that the Association did provide sufficient argument and citations to the trial court to preserve the issue on appeal.

alleged "negligent *design* and construction." 875 P.2d at 573 (emphasis added). Although the court of appeals did not analyze the claim of negligent design separately, it concluded that "Maack's claims for purely economic damages based upon allegations of negligent *design* and construction must fail." *Id.* at 581 (emphasis added). Further, the court in *Maack* based its adoption of the economic loss rule in part on an Illinois Supreme Court decision that applied the doctrine to bar negligent design and supervision claims against a design professional. *See id.* at 580 (citing *2314 Lincoln Park West Condominium Ass'n,* 144 Ill.Dec. 227, 555 N.E.2d at 348); *see also Atherton Condominium Bd. v. Blume Dev. Co.,* 115 Wash.2d 506, 799 P.2d 250, 262 (1990) (en banc) (economic loss doctrine bar to owners association's negligence claim involving architect).

The Association relies upon Restatement (Second) of Torts § 324A, which provides:

> One who undertakes ... to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for *physical harm* resulting from his failure to exercise reasonable care....

(Emphasis added.) This section does not strengthen the Association's position. The comments following the section underscore that its scope is limited to claims for "physical harm" to persons or property, neither of which is present here.[14] *See* Restatement (Second) of Torts § 324A cmt. b (1965).

In sum, the Association's negligence claim pertains solely to its members' unmet expectations regarding the quality of their purchases, i.e., cumulatively, the entire complex, including its plumbing and mechanical systems. As one court explained:

> Plaintiff homeowners faced with losses that are not of their own making present[ ] a sympathetic case.... We must exercise caution, however, that we do not unduly upset the law upon which expectations are built and business is conducted.

*Stuart v. Coldwell Banker Commercial Group, Inc.,* 109 Wash.2d 406, 745 P.2d 1284, 1290 (1987). To allow the claim would be to impose the members' economic expectations upon parties whom the members did not know and with whom they did not deal and upon contracts to which they were not a party. We agree with the trial court's conclusion that no cause of action for negligence exists under these circumstances.

## UNJUST ENRICHMENT

▪ The Association additionally asserted a cause of action for unjust enrichment. The district court held that the claim "fails as a matter of law because (a) the subject matter of the claim was pre-empted by the existence of express contracts; (b) plaintiff conferred no benefit upon defendants; and (c) any enrichment of defendants was not unjust because it was the consideration bargained for under express contracts." We agree.

" 'Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another....' " *Commercial Fixtures & Furnishings, Inc. v. Adams,* 564 P.2d 773, 776 (Utah 1977) (quoting *Baugh v. Darley,* 112 Utah 1, 184 P.2d 335, 337 (1947)). We have held:

> Three elements must be present before unjust enrichment may serve as a basis of recovery:
>
> > [T]here must be (1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.

*Concrete Prods. Co. v. Salt Lake County,* 734 P.2d 910, 911 (Utah 1987) (quoting *Berrett v. Stevens,* 690 P.2d 553, 557 (Utah 1984)). In other words, the remedy is one of restitution designed to restore to a plaintiff a benefit unjustly enjoyed by a defendant. *Commercial Fixtures,* 564 P.2d at 776.

---

**14.** Although various elements of the condominiums themselves were damaged, property damage was not present for the purposes of the Restatement in that no damage resulted to *other* property, separate and distinct from the condominiums. *See Maack,* 875 P.2d at 580, and Economic Loss discussion above.

The doctrine is designed to provide an equitable remedy where one does not exist at law. In other words, if a legal remedy is available, such as breach of an express contract, the law will not imply the equitable remedy of unjust enrichment. *Mann v. American Western Life Ins. Co.*, 586 P.2d 461, 465 (Utah 1978) ("Recovery in quasi contract is not available where there is an express contract covering the subject matter of the litigation."); *Davies v. Olson*, 746 P.2d 264, 268 (Utah.Ct.App.1987) ("Recovery under *quantum meruit* presupposes that no enforceable written or oral contract exists."). In this case, each defendant is party to a construction contract which addresses the specific subject matter of the Association's unjust enrichment claim. The contracting parties were apparently satisfied with each other's performance because they each paid the contract price and accepted the work performed as meeting their contract terms. The Association, a stranger to these contracts, cannot now demand that defendants adjust the contract price by complaining that defendants were unjustly enriched. *See Knight v. Post*, 748 P.2d 1097, 1101 (Utah.Ct. App.1988) (denying quantum meruit claim against nonparty to construction contract).

The district court's other conclusions regarding this claim are also correct. The Association did not confer any benefit upon any of the defendants and therefore cannot claim that defendants have been unjustly enriched. Any enrichment received by defendants was not to the detriment of the Association because it did not pay any of the consideration which defendants received under their contracts. Finally, defendants' retention of the benefits under their construction contracts was not unjust. Defendants all provided services and materials in exchange for their contract price. That value was accepted as sufficient and appropriate. We conclude as a matter of law that the construction defendants were not unjustly enriched.

## IMPLIED WARRANTY OF HABITABILITY

The Association further asserted an implied warranty of habitability claim. The district court held that this claim "fails as a matter of law because the defendants were not lessors of residential rental units, and Utah does not recognize such legal claims." The Association concedes that Utah law does not recognize such an action in the context of residential sales but urges this court to extend the law to this area.

In *Wade v. Jobe*, 818 P.2d 1006 (Utah 1991), this court held that a *landlord* of *leased* residential property may be liable for breach of an implied warranty of habitability. We reasoned that such a warranty is necessary because tenants lack the skill, means, and bargaining power to ensure the habitability of leased premises. *Id.* at 1010. However, we have not extended such a warranty to *purchasers* of residential property.

In *Maack*, the court of appeals explained:

The main policy reasons behind extending an implied warranty of habitability to residential leases are the unequal bargaining position of the parties and the prospective tenant's limited ability to inspect and repair the property. *These policy reasons are not present to the same degree in the purchase of residential property.* The purchaser has the right to inspect the house before the purchase as thoroughly as that individual desires, and to condition purchase of the house upon a satisfactory inspection report. Further, if there are particular concerns about a home, the parties can contract for an express written warranty from the seller. Finally, if there are material latent defects of which the seller was aware, the buyer may have a cause of action in fraud. Therefore, *the circumstances presented to the purchaser of a residence are not closely analogous to those of a relatively powerless lessee . . . .*

875 P.2d at 582–83 (emphasis added).

The Association contends that *Maack* is distinguishable because the plaintiff was "an experienced attorney" who "conceded that a reasonable inspection of the home at the time of the purchase would have revealed all the alleged defects." We disagree and find that the reasoning in *Maack* is sound. The terms of a contract for the sale of a residence are much more open to negotiation than a rental

contract because the buyer and seller have similar bargaining power. If the seller refuses to accede to an express warranty, nothing prevents the buyer from halting negotiations and looking elsewhere. Tenants often do not have that luxury and are more prone to take what they can get.

The Association contends that condominium purchasers are especially susceptible to latent defects and do not have a feasible opportunity to conduct an inspection. We disagree. The condominium buyer, like the home buyer, is investing in the ownership of a residence rather than making rental payments for a transient dwelling. The buyer has the incentive and the means to inspect the unit before purchase. As noted in the economic loss section above, a condominium homeowners' association typically oversees the management, maintenance, and operation of the units. The potential buyer can contact this association, which is equipped to know of, respond to, and guard against defects in the complex. We are unconvinced that a condominium buyer is analogous to "a relatively powerless lessee." Accordingly, we affirm the district court's denial of this claim.

## BLOCK ASSOCIATES, INC.

■■■ All of the defendants in this action except Block Associates, Inc. (BAI), responded to the Association's second amended complaint and were eventually granted summary judgment. Consequently, the Association filed a motion for entry of default judgment and an affidavit of its expert witness ostensibly establishing damages against BAI in the amount of $10.23 million. The district court directed entry of BAI's default but denied the request for a money judgment, holding that granting one "would be inconsistent with the law of this case as determined by this Court's rulings on plaintiff's claims against the other defendants."

We recently explained the law-of-the-case doctrine in *Thurston v. Box Elder County,* 892 P.2d 1034 (Utah 1995):

> [A] court is justified in refusing to reconsider matters it resolved in a prior ruling in the same case for reasons of efficiency *and consistency.* The doctrine is not a limit on power but, "as applied to the effect

of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided." It rests on " 'good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards.' "

*Id.* at 1038–39 (emphasis added) (citations omitted).

BAI had originally functioned as the corporate general partner of Block 58 Associates, one of the defendants that already had been granted summary judgment. BAI had become defunct and was involuntarily dissolved by the Department of Commerce on September 1, 1989, two years before this action was originally filed. For the district court to have ruled as the Association requested would have created diametrically opposed and inconsistent judgments in this case.

"Defendant's failure to answer and ensuing default ... require the court to accept the factual allegations as true, but the court [should] enter judgment as requested *only if it determined those facts established an actionable claim." Stevens v. Collard,* 837 P.2d 593, 596 n. 5 (Utah.Ct.App.1992) (emphasis added). Were the rule otherwise, a court could be obligated to enter a money judgment on a complaint as frivolous as a refusal to share recipes with a neighbor. *Id.* Thus the court must determine whether an actionable claim exists.

The district court declined to enter a multimillion dollar default judgment in favor of the Association in view of its previous rulings finding that the claims failed as a matter of law. We find no error.

## DENIAL OF MOTION TO CONTINUE DISCOVERY

Beginning in May 1994, most of the defendants filed motions for summary judgment. In response, the Association moved for a continuance under rule 56(f) of the Utah Rules of Civil Procedure, on which motion the court apparently did not rule. In July 1994, the Association filed a second rule 56(f) motion. The Association asserted that one

year (since the filing of its second amended complaint) was an insufficient period to conduct discovery given the size and complexity of the case. More specifically, it stated that it needed more time to examine (1) when certain statutes of limitations began to run, (2) the intent of the parties on its third-party beneficiary claim, (3) "the parties' undisclosed knowledge of the defects of the project," and (4) the relationships and agreements of the various parties.

■■■ The district court conducted a hearing in August 1994, denied the Association's rule 56(f) motion, and granted all of the summary judgment motions. The Association argues that the court erred in denying its motion to continue discovery.

> Rule 56(f) provides:
> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that he cannot ... present ... facts essential to justify his opposition, the court may refuse the application for judgment and may order a continuance to permit affidavits to be taken or depositions to be taken or discovery to be had or may make such other order as is just.

Utah R. Civ. P. 56(f). We review a trial court's decision to grant or deny a motion under this rule under the abuse of discretion standard. *Crossland Sav. v. Hatch,* 877 P.2d 1241, 1243 (Utah 1994). While a party's rule 56(f) request is to be liberally considered, such *motions may be properly denied where* they are found to be "lacking in merit." *Id.; Jones v. Bountiful City Corp.,* 834 P.2d 556, 561 (Utah.Ct.App.1992) (trial court should not grant rule 56(f) motion to protect party from merits of motion for summary judgment). In *Jones,* the court rejected a rule 56(f) motion where, even if the facts the plaintiff believed would be discovered were actually borne out, they would not have been legally relevant to the narrow issue before the court on summary judgment. 834 P.2d at 562.

■■■ The holding in *Jones* applies here. The Association's second amended complaint sought damages for unjust enrichment, breach of contract/warranty (third-party beneficiary), negligence, and breach of implied warranty. We have affirmed the district court's holding that each of these four claims fails as a matter of law. In addition, we have held that First Security was released from these claims and that the Association was not entitled to a money judgment against Block Associates, Inc. These two conclusions were also matters of law. As in *Jones,* the facts that the Association seeks to discover would not be legally relevant to the resolution of these issues. *See also Callioux v. Progressive Ins. Co.,* 745 P.2d 838, 841 (Utah.Ct.App. 1987) (movant "must explain how the continuance will aid his opposition to summary judgment," and additional discovery requested must be "material and of a substantial nature"). We conclude that the district court did not abuse its discretion in denying the Association's motion to continue discovery.[15]

We affirm the district court's grant of summary judgment to each of the defendants.

ZIMMERMAN, C.J., and DURHAM, J., and PAMELA T. GREENWOOD, Court of Appeals Judge, concur.

Having disqualified himself, RUSSON, J., does not participate herein; PAMELA T. GREENWOOD, Court of Appeals Judge, sat.

STEWART, Associate C.J., does not participate herein.

---

15. The district court also held that the Association's claims were barred by the applicable statutes of limitations and that the "discovery rule" did not apply to toll the running of the statute of limitations. However, in light of our holdings on the other issues in this case barring the Association's claims, we determine that it is unnecessary to reach these issues.