**COOK ASSOCIATES, INC. dba Cook Slurry Company, a Utah corporation, Plaintiff,**

v.

**PCS SALES (USA), INC., a Delaware corporation, Defendant**

No. 2:01–CV–00389.

United States District Court,
D. Utah,
Central Division.

March 14, 2003.

Blake S. Atkin, Esq., Atkin & Hawkins, Salt Lake City, UT, for Plaintiff.

Paul D. Veasy, Esq., Parsons Behle & Latimer, Salt Lake City, UT, for Defendant.

## MEMORANDUM OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

CASSELL, District Judge.

### SUMMARY

This case arises out of the unraveling of a ten-year relationship between plaintiff, Cook Associates, Inc. ("Cook"), and defendant, PCS Sales, Inc. ("PCS"). Since 1990, Cook purchased hot ammonium nitrate solution, known as "AN 83," and ammonium nitrate prills from PCS Sales or its predecessor, Arcadian Corporation. These deliveries were all supplied by PCS Sales' Clinton, Iowa plant to Cook's Gilbert, Minnesota plant. Cook used the hot ammonium nitrate solution and ammonium nitrate prills, in combination with other ingredients purchased from other vendors, to manufacture explosive slurry used in mining.

The relationship between Cook and PCS went smoothly until February 1999. From October 1998 through February 1999, PCS delivered $187,312 of hot ammonium nitrate solution and ammonium nitrate prills to Cook, for which Cook refused to remit payment. When PCS threatened to go to court to force payment, Cook filed this action alleging that the shipments were defective, causing a failed shot on February 10, 1999, and the subsequent loss of its contract with an iron ore mine in Minnesota, the "LTV mine." PCS counterclaimed for payment on the receivables. The court currently has before it PCS's motion for summary judgment. For the reasons explained below, the court GRANTS the motion.

### FACTS

#### *Delivery of the AN 83 solution and AN prills*

In January 1999, Cook placed and received sixteen orders of hot ammonium nitrate solution from the PCS Sales' Clinton plant, of which five shipments are in dispute. Upon delivery, Cook was given a bill of lading for each order of hot ammonium nitrate solution. The bills of lading for

the five deliveries listed the following information:

| Date | Cust. | # PCS Sales pH | PCS Sales Concentration | Temp. |
|------|-------|----------------|-------------------------|-------|
| January 14, 1999 | 2–6223 | 5.26 pH | 82.9 concentration | 235° |
| January 14, 1999 | 2–6224 | 5.86 pH | 82.9 concentration | 240° |
| January 20, 1999 | 2–6227 | 5.97 pH | 83.3 concentration | 240° |
| January 20, 1999 | 2–6230 | 5.97 pH | 83.3 concentration | 225° |
| January 24, 1999 | 2–6243 | 5.98 pH | 82.75 concentration | 240° |

Upon receiving each shipment, Cook took it's own pH measurement and recorded this measurement on an "AN200 Emulsion Report." The AN200 Emulsion Report for the five disputed shipments contained the following information:

| Date | Cust. | # PCS SALES pH | Cook pH |
|------|-------|----------------|---------|
| January 15, 1999 | 2–6223 | 5.26 pH | 6.3 pH |
| January 15, 1999 | 2–6224 | 5.86 pH | 6.5 pH |
| January 21, 1999 | 2–6227 | 5.97 pH | 6.5 pH |
| January 21, 1999 | 2–6230 | 5.99 pH | 6.5 pH |
| January 25, 1999 | 2–6243 | 5.98 pH | 6.5 pH |

After Cook reviewed the pH measurement on the bill of lading and took its own pH measurement, Cook added other ingredients to each shipment of AN 83 solution to adjust the pH level. Cook also purchased several shipments of ammonium nitrate prills (pellets) from PCS, that it combined with the AN 83 solution, transformer oil, and smaller amounts of emulsifier, a proprietary product made from two common chemicals, to make its emulsification explosive product ("PEP blend").

### The February 10, 1999 Incident

On February 10, 1999, Cook transported its PEP blend to the LTV mine for loading into mine boreholes. As the PEP blend was being pumped into the bore holes one of Cook Slurry Company's operators noticed a breakdown or separation of the emulsification. Subsequently, Cook was required by LTV to remove the PEP blend from the borcholes and ordered to leave without completing that day's shot. Following this failed shot, Bill Penrod (the plant manager and acting president of Cook at that time) performed an investigation into the causes of the incident as direct by Merrill Cook, owner of Cook Slurry. As part of the investigation, Penrod inquired with PCS whether anything was out of the ordinary. Upon the conclusion of the investigation, Penrod found nothing out of the ordinary. However, Cook's contract with LTV mine was not renewed in 1999.

As of April 7, 1999, Cook had an outstanding account payable to PCS Sales in the amount of $187,312. Business communications on this subject continued. On April 6, 1999, David Cook, Cook's Chief Financial Officer, sent PCS Sales a letter requesting that PCS Sales accept "$.60 per dollar on [Cook's] current balance." In that letter, Mr. Cook stated that, due "predatory pricing practices on the part of competitors and overaluation of raw material prices on the part of suppliers," Cook "has been forced to close its doors." [1] The letter further stated that Cook "is unable to pay 100% of what it currently owes its creditors" and that it will be "forced to settle with those it owes money at less

1. Addendum to Def.'s Memo. Support, Exhib- it 46.

than the credited amounts." [2] Nowhere in the letter does Cook state that it believes PCS Sales provided non-conforming product, nor does it refer to the February 10 incident. On July 15, 1999, PCS's credit manager, Stephen Farnsworth, sent a letter to Cook requesting a call to discuss this outstanding balance.[3] On September 26, 1999, Merrill Cook sent a letter to PCS claiming that PCS Sales had provided "off spec ammonium nitrate" to Cook and that Cook's "lawyer will be contacting [PCS Sales] shortly to talk over what can be done to settle this matter." [4] On November 18, 1999, Farnsworth responded to Cook's September 26 letter, stating that PCS Sales found Cook's threat of lawsuit meritless and that PCS would follow another course of action if he did not receive word from Cook regarding payment of it's debt within ten days. There was no response from Cook. On May 15, 2001, PCS Sales instructed its counsel to send a letter to Cook demanding full payment within 10 days of the date of the letter (i.e., by May 25, 2001). On May 25, 2001, Cook filed this action.

## DISCUSSION

The legal standard on a motion for summary judgment is well settled. The court must determine "whether there is a genuine issue for trial." [5] "If the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party." [6] Therefore, PCS must demonstrate "that there is an absence of evidence to support [Cook's] case." [7]

### Settlement Discussions

■ Cook initially argues that evidence of its offer on April 6, 1999, to pay $.60 on the dollar and the related explanation that the cause of its problems was its competitors should be excluded as settlement discussion. The court finds that these discussions were not settlement discussions, but rather were "business communications" because "discussions had not crystalized to the point of threatened litigation ...." [8] In addition, the discussion does not show that Cook was disputing either the validity or the amount of PCS's claim, a requirement for exclusion under the settlement discussion rule.[9] These statements are therefore admissible in this and other proceedings.

### *Choice of Law*

Cook's complaint alleges three causes of action: breach of contract, breach of warranty, and negligence. A preliminary issue immediately arises in assessing these claims—what law applies? This case is a diversity case. PCS contends that the

---

2. *Id.*

3. Addendum to Def.'s Memo. Support, Exhibit 47.

4. Addendum to Def.'s Memo. Support, Exhibit 48.

5. *Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1222 (10th Cir.2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

6. *Ortiz–Molina v. MAI Del Caribe, Inc.*, 83 F.Supp.2d 271, 273 (2000).

7. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

8. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372–73 (10th Cir.1977).

9. *See* Fed.R.Evid. 408.

contract between the parties requires application of Tennessee law. In the alternative, PCS maintains that Minnesota law should apply, as Minnesota has the greatest number of contracts with the parties and the dispute. For example, the contract at issue was to be performed in Minnesota, both plants were located in Minnesota, and the underlying events took place in Minnesota. Cook, on the other hand, takes the position that its place of incorporation, Utah, provides the substantive law.

The choice of law issues are potentially complex. Both parties agree, however, that the controlling legal principles applicable to this dispute would not vary depending on the jurisdiction. For example, all three states have adopted the relevant provisions of the Uniform Commercial Code ("UCC"). The parties have not briefed the choice of law issues. Accordingly, the court will not resolve the issue and, purely for convenience, will cite Utah law (such as the Utah statutes containing the UCC) as illustrative of the general principles.

### Breach of Contract and Warranty Claims

In its first cause of action, Cook alleges that PCS breached its contract with Cook by selling ammonium nitrate solution that did not meet the stringent specifications required by Cook, required by the course of dealing between the parties, and based on usages of trade in the industry. In its second cause of action, Cook alleges breach of express warranties made by PCS that its products conform to the stringent specifications required by Cook and breach of implied warranties of merchantability and fitness for a particular purpose.

### 1. *The Contract.*

The court finds as a matter of law that the UCC applies to the transactions between Cook and PCS. Article 2 of the UCC "applies to transactions in goods."[10] According to the UCC, "goods" are defined as "all things ... which are movable at the time of identification to the contract for sale ...."[11] PCS manufactured ammonium nitrate ("AN") solution and prills, which PCS delivered to Cook. Therefore, the AN solution and prills were movable at the time of identification to the contract for sale and are governed by Article 2 of the UCC as goods. In addition, the court finds that Cook and PCS are "merchants" under the UCC. The UCC defines a merchant as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction ...."[12] The issue of whether the parties are merchants is undisputed and is supported by the record.[13] Therefore, Cook and PCS are merchants dealing in goods with their relationship governed by the provisions of the UCC.

PCS's principle argument is that all of Cook's causes of actions are barred by express terms in the parties contract. PCS contends that the four relevant contractual documents are (1) a July 17, 1990, credit agreement, (2) price schedules, (3) specification sheets, and (4) PCS's material safety data sheets ("MSDS"), all of which were provided to Cook over a period of

10. Utah Code Ann. § 70A–2–102.

11. Utah Code Ann. § 70A–2–105.

12. Utah Code Ann. § 70A–2–104(1).

13. Def.'s State. Undisputed Facts ¶¶ 9, 13.

years by PCS (or its predecessor, Arcadian). PCS takes the position that the applicable UCC provisions, specifically section 2–208, requires the application of the terms of these four documents. Section 2–208 provides, in pertinent part, as follows:

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, *any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.*[14]

(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, *express terms shall control course of performance* and course of performance shall control both course of dealing and usage of trade.[15]

If binding, these documents undoubtedly require summary judgment. For example, the price schedules sent to Cook include an exclusion of warranties provision, a one-year statute of limitations on all breach of contract claims, and a provision excluding consequential damages. Thus, Cook's claims fail under these contractual provisions because Cook filed this action outside of the statute of limitation and seeks recovery on the warranties that were expressly disclaimed by PCS.

Faced with these apparently insurmountable documentary barriers, Cook argues that the documents (with the exception of the 1990 credit agreement and the specification sheets) do not evidence the parties' actual agreement. Cook, through the deposition testimony of Merrill Cook, contends that certain provisions of the documents were not enforced by PCS, and therefore, the documents did not represent the parties business agreement and were not binding on Cook. More specifically, Merrill Cook described Cook's position with regard to these documents as follows:

[W]e could care less of anything that was sent out to [Cook] that was boilerplate sent to anybody on the mailing list. Whether it was Arcadian, whether it was PCS, it didn't really apply to us .... I don't think [the PCS Sales price schedules] had any bearing. We wouldn't have ... they never told us to look at that or worry about that .... Even if we got a piece of paper like this in the mail, we wouldn't have been concerned about that.[16]

The court is skeptical of Cook's position. It seems odd (to put it mildly) that two sophisticated commercial entities—transacting hundreds of thousands of dollars in business—never had an underlying written contract of any sort to govern their relationship. More generally, it would be disruptive of ordinary commercial relations if a merchant-debtor could escape summary judgment in an action to collect a debt through the simple expedient of testifying that they "could care less" about any disclaimer of warranties or limitation of liability sent to them by their supplier. Therefore, PCS may well be correct that summary judgment is appropriate on this ground.

---

14. Utah Code Ann. § 70A–2–208(1).

15. Utah Code Ann. § 70A–2–208(2) (emphasis added).

16. Cook Depo. vol. I, 79:12–80:18 (Aug. 28, 2002).

The court, however, prefers to rest summary judgment on alternative grounds. In proceeding in this fashion, the court will accept, for the sake of argument, Cook's claim that the price schedules, specification sheets, and PCS's MSDS sheets were not included in the parties contract. Even so, as a matter of law, Cook has not satisfied its burden to produce sufficient evidence of implied or express contractual requirements or warranties breached by PCS.

### 2. *Cook accepted the goods.*

 Under the Uniform Commercial Code, a buyer of goods has the right to make a reasonable inspection. In particular, the Code provides: "Unless otherwise agreed ..., where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect them at any reasonable place and time and in any reasonable manner." [17] After a reasonable time for inspection, a rejection of the goods will be found unseasonable. As the Code explains:

Acceptance of goods occurs "when the buyer (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or (b) fails to make an effective rejection ..., but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them ..." [18]

Acceptance of goods also occurs when the buyer does any act inconsistent with the seller's ownership.[19] Revocation of a buyer's acceptance must occur before any substantial change in condition of the goods is made that is not caused by their own defects.[20]

Each delivery by PCS contained information on the bills of lading about the AN solution and prills including the pH level, quantity, concentration, and temperature measurements for the AN solution. Upon receiving each shipment, Cook made its own pH measurement and recorded both the pH level measured by PCS and the pH level measured by Cook. In each and every one of the alleged out of specification shipments, Cook added other ingredients, altering the pH level of the product as Cook deemed necessary.

The court finds based on the undisputed facts that Cook would not have used the entire shipment of AN 83 solution and AN prills to manufacture emulsification explosive unless Cook determined that it had reasonable time to inspect the AN 83 solution and AN prills. Further, the court finds that Cook accepted the AN 83 solution and AN prills by mixing them with oil and emulsifier to make emulsion explosives, which is inconsistent with PCS's ownership of the products. Moreover, the court finds that Cook lost its right to revoke the AN solution and AN prills when it added ingredients to alter the pH, or added oil and emulsifier to manufacture emulsion explosive creating a substantial change in condition of the goods. The court also considers it significant that Cook not only retained the AN solution and AN prills without complaint, but also used the entire shipment to manufacture emulsion explosive without retaining and

---

**17.** *See* Utah Code Ann. § 70A–2–513(1).

**18.** *See* Utah Code Ann. § 70A–2–606(1)(a) and (b).

**19.** Utah Code Ann. § 70A–2–606(1)(c).

**20.** Utah Code Ann. § 70A–2–608(2).

testing a small quantity for the purpose of preserving some evidence of claimed inferior quality. Even if the court assumes that the AN solution was outside of a required pH or concentration specification requirement, Cook cannot now reject the goods based on the pH or concentration shown on the bills of lading or emulsion report because Cook accepted the goods with knowledge of the goods non-conformity with any asserted requirement.

Finally, when Cook ran into financial difficulties, it made no mention of any purported problem in the products. Instead, it referred to the tough competitive marketplace in which it operated and sought to pay $.60 on the dollar because of its difficulties. It was only later—on the eve of an apparent collection action by PCS—that Cook decided to raise a claim that it was rejecting the goods.

3. *Cook has not satisfied its burden to produce sufficient evidence for a reasonable jury to find that PCS breached a contractual requirement or warranty.*

█ Defendant PCS, the moving party in this summary judgment motion, bears the initial burden of demonstrating the absence of a genuine issue of fact. However, according to the UCC, "[t]he burden is on the buyer to establish any breach with respect to the goods accepted."[21] In these circumstances, the burden of proof on the issue of soundness at the time of sale cannot fairly rest on the seller where the buyer has taken possession of the goods, substantially modified them, transported the modified goods to the job site, used the modified goods outside of the

seller's control, stored the modified goods for almost a month before the injury, and waited about eight months before informing the seller of an alleged defect. Even in the case of a latent defect, in these circumstances the existence of a defect or causation of the injury must still be shown by Cook.

As Cook itself points out, "the exact nature of the defect cannot be established"[22] and the court finds that the facts set forth by Cook do not support the allegation that PCS sold Cook out-of-specification goods during January 1999. The uncontroverted evidence does, however, establish a sale and delivery of the goods in question, the defendant's acceptance of the goods, and Cook's failure either to pay the agreed upon price, or raise a specific objection to the sale terms when the goods were delivered or within a reasonable time thereafter.

Because PCS provided Cook with two kinds of product—AN 83 solution and AN prills—it is useful to bifurcate the analysis of defect in the products.

a. *Alleged defects in the AN 83 solution.*

Cook itself appears uncertain as to the specifics of its warranty and contract claim concerning the AN 83 solution. Cook asserts, and the court assumes for purposes of this order, that the requirements and disclaimer of warranties provided within the price schedules and MSDS sheets are not binding—although PCS has very strong arguments on these points. Cook alleges, however, that the specification sheets provided by PCS provide evidence of express warranties and exhibit the

---

**21.** Utah Code Ann. § 70A–2–607(4).

**22.** Cook's Memo. Opposition p. 14.

agreement between the parties. Cook asserts that the specification sheet warranted minimum strength (83.9), minimum total nitrogen (29.0%), maximum alkalinity (as ammonia)(0.5%), specific gravity (1.290), and density (11.58). In addition, Cook claims that PCS warrantied and agreed to provide the AN 83 solution within a specified range of pH levels and Galoryl levels.

Without evidence to support any other avenue, Cook's breach of warranty and contract claim with respect to the AN 83 solution centers around the pH levels measured by Cook and whether the pH was within specification. Surprisingly, after approximately 20,000 pages of documents being produced, fifteen depositions taken, and five experts employed, Cook still does not appear to have met its burden of identifying a specific range of acceptable pH levels. It is undisputed that the pH level of the five deliveries of ammonium nitrate solution in January 1999 range from 5.26 to 5.98. Initially, Bill Penrod, plant manager of Cook's Gilbert, Minnesota plant, testified that Cook's internal specification for pH of ammonium nitrate deliveries was 4.0 to 7.0.[23] Later, Penrod may have "corrected" himself to specify a range of 5.5 to 6.0.[24] Taking this narrow view, only one of the shipments was out of compliance with any alleged warranty. With respect to the single shipment in question, Penrod specifically testified in his deposition that it was found acceptable to Cook.[25] Merrill Cook also had difficulty identifying a specific pH requirement testifying that there was no "upper limit" for pH, so a pH over 7.0 was acceptable.[26]

The court finds that the parties relationship and course of dealing is the most clear indication of their agreement. It is undisputed that Cook knew of PCS's product measurements on the bills of lading given to Cook upon delivery. It is further undisputed that Cook took its own pH measurements of the AN 83 solution when it arrived at its plant. Cook kept both the AN 83 solution and AN prills in its possession without complaint having knowledge of the information on the bills of lading and its own pH measurements. Thus, the record shows that the pH levels were acceptable to Cook and clearly demonstrate acceptance with knowledge of the pH and information on the bills of lading. Therefore, there can be no breach of warranty or contract claim with respect to the AN 83 solution.

b. *Alleged defects in the prills.*

Cook's claim for breach of contract and warranty with respect to the prills centers around their oil absorption rate. Cook asserts that the specification sheet warranted purity (97.2%), maximum moisture content (0.15%), maximum organic content (0.15%), and minimum oil absorption (6%). With respect to the prills, Cook concedes that it did not have any significant evidence of a defect until well after this lawsuit was filed. Cook claims, however, that it discovered evidence of defect on August 13, 2002, when it took the deposition of Jim Hersey. Jim Hersey was the quality leader for PCS's Clinton, Iowa plant since 1997. Because his testimony is the *only* substantive evidence supporting this claim, it is worth reviewing his deposition answers at some length.

23. Penrod Depo. 76:15–25 (Aug. 30, 2002).

24. *Id.* 107:13–108:3.

25. *Id.* 76:2–14.

26. Cook Depo. 131:25–132:22 and 133:5–14 (Aug. 28, 2002).

Q. Okay. Do you recall anyone in particular who complained about the oil absorption in the prills?

A. I believe Continental Nitrogen was one of them.

Q. Do you recall ever receiving any complaints from Cook Slurry Company regarding the prills?

A. I'm not certain if there was one from there or not.

Q. In what time period did you receive complaints about the oil absorption of the prills?

A. I believe—again, without looking at backup records that I haven't been able to locate, from what I can recall, I believe it was back in like the summer of '98.

Q. Was there any investigation done of the complaint?

A. Yes.

Q. Do you know what the outcome of that investigation was?

A. One of the things that we seen come out of that investigation was that the 626 additive seems to hold oil on the outside of the prill when it's fresh, which causes inflated or higher oil absorption when you run the test. After that prill sits for a time frame, that oil absorption drops by maybe as much as a percent. So that modified some of our procedures as to how we what we targeted on the oil absorptions.

Q. And the product you're talking about is the Galoril coating?

A. Yes.

Q. And so you made some modifications in 1998 as a result of the complaint that—the investigation of the complaint regarding oil absorption?

A. I believe that's those dates are roughly correct.

Q. What modifications did you make with regard to the prills?

A. We changed our target range. We increased that oil absorption target range slightly on it didn't change in the operating parameters for the plant.

Q. Can you give me an idea or do you know what the magnitude of the change was in the oil absorption rate?

A. It—I'm not absolutely certain. It was roughly a one percent change on the oil absorption.

Q. You're saying it didn't change the specification because you thought that you had been reaching the target specification, but because of the interaction of the Galoril, your process before that had been off by one percent or so?

A. Yes. At certain times it appeared that Galoril drove the oil absorption test to be off by approximately one percent.

Q. Did you notify your customers of the change in procedure that you implemented sometime in 1998?

A. Through the investigation of that complaint, which I believe, like I say, was with CNR, they were notified of the follow-up or corrective actions or findings. As far as officially notifying anyone else, I don't recall that happening.

Q. So you don't know whether Cook Slurry was notified of that change in procedure?

A. I'm not aware of if they were or were not notified.

Q. Isn't that the kind of thing that you would normally notify your customers about, if you changed the procedure that changed the absorption rate of the prills that they were purchasing?

A. If it was truly impacting the final product specification, but what we were seeing was that the implant absorption that we were controlling off of, controlling the process off of, which was an operating parameter, was what was at times giving a false indication, and the change should not have impacted the final product specification. It was not a change in the final product specification.

Q. I understand that. You changed your procedure in order to fit within the product specification, is that fair to say?

A. Yes.

Q. But the procedure you had been using before that had resulted in prills that actually had a lower absorption rate than the specification?

A. The process before that had at times resulted in a lower oil absorption rate than our specification.

Q. Right. So while you didn't change the specifications, you changed the actual characteristics of the prills?

A. Yes, that's correct.

Q. And the process that you employed before that change was made in 1998, how long had that process been in place and used by your Clinton, Iowa plant?

A. Again, I'm not certain on precise dates, but it would have been I believe in '95 when we had went on the—I believe that's when we went up to the KT process which utilizes the internal additive and the external Galoril additive.[27]

The parties have spilled considerable ink discussing the importance of these remarks. Conceivably, these remarks could be viewed as ambiguous. If so, they would be a terribly slim reed on which to rest Cook's case regarding defective prills. However, to the extent that there is any ambiguity, it is clarified by Hersey's subsequent affidavit. In that affidavit, Mr. Hersey states as follows:

In the process by which ammonium nitrate was manufactured, including the process at the PCS Sales' Clinton, Iowa plant, internal operating control parameters, targets or ranges are established. These parameters, targets or ranges are used during production to ensure that the final product meets or exceeds established product specifications. It is not uncommon to have operating control parameters, targets or ranges with more restrictive limits than the shipping specifications for the product.[28]

Hersey goes on to affirmatively state that it was the "operating parameter that he was referring to in the deposition and not the 'final product parameter' in his deposition."[29] From careful review of the deposition, it is clear to the court that Hersey was discussing deviations from internal operating specifications not the final

---

27. Depo. Hersey 145–150 (Aug. 13, 2002).

28. Hersey Aff. ¶ 2.

29. *Id.* at ¶ 4.

product specifications. For example, in his deposition, Hersey states in his own words,

> [W]hat we were seeing was that the implant absorption that we were controlling off of, controlling the process off of, which was an operating parameter, was what was at times giving a false indication, and the change should not have impacted the final product specification. It was not a change in the final product specification.[30]

Clearly, what Mr. Hersey was saying in his original deposition was that the final product was within specification.

Perhaps recognizing that Hersey's affidavit defeats any claim regarding prills, Cook has filed a motion to strike the affidavit. At oral argument, the court denied the motion to strike. Because of the importance of this issue to Cook, the court has carefully reexamined Cook's motion to strike. Having done so, the court—once again—reaches the conclusion that the motion to strike the affidavit should be denied. Any ambiguities on this point were created by abbreviated questions by Cook's counsel that were less precise than they could have been. In the wake of confusion created by such questions, a clarifying affidavit is entirely appropriate.

At a minimum, Cook would have to provide evidence of deviations from final product specifications at least below the 6% requirement listed in PCS's specification sheet to support Cook's claim. The bottom line conclusion of Hersey is that he is aware of no occasion on which PCS's Clinton plant shipped prills with an oil absorption rate lower than the shipping specification to any customer.[31] As a result, Cook's

breach of warranty claim rests on no evidence whatsoever.

### c. Spoliation of Evidence.

As one last fallback position, Cook raises the contention that PCS "destroyed" documents that would have proven the products were defective. Cook claims that this spoliation of evidence entitles it to proceed to the jury.

The facts surrounding this destruction of documents do not appear to be disputed. In August 1999, PCS Sales made a decision to close the Clinton plant and a plant in Nebraska. These plants were closed because they were old, non-economically viable plants. There is no evidence that they were closed because of Cook's claim—which was not filed until May, 2001. In the ordinary course of business in closing these plants, various plant documents were shredded. This process began in January 2000. Cook has not argued that the destruction of documents continued after the filing of its action in May 2001. Cook has argued, in a claim that is disputed, that it had put PCS on notice in March 1999 that it was receiving "off-spec" product.

Before turning specifically to spoilation, it is important to understand Cook does not actually have any proof that any of the documents which were destroyed would have affirmatively demonstrated a defect. Instead, they wish to argue that the destruction of the documents should create some sort of inference that the evidence would have been favorable to it. Cook does not cite supporting authority for its claim.

It appears to the court that Cook could conceivably assert two theories of spolia-

---

**30.** Depo. Hersey 148:21–149:5.

**31.** Hersey Aff. ¶ 8.

tion. One is the tort of spoliation of evidence and the other is an evidentiary remedy for spoliation. Neither could apply in this case.

■■■ The tort of spoliation encompasses a party's "intentional or negligent destruction or loss of tangible evidence, which destruction or loss impairs a person's ability to prove or defendant a prospective civil action." [32] Under the spoliation doctrine, "where *a party to an action* fails to provide or destroys evidence favorable to the opposing party, the court will infer the evidence's adverse content." [33] Cook fails to cite any judicial authority supporting a tort of spoliation. Cook has also argued that the law of Utah should govern this action. The Utah Supreme Court, having had the opportunity to adopt the tort of spoliation, refused to do so.[34] As a result, Cook has no legal basis for asserting a tort of spoliation.

■■■ With regard to the evidentiary remedy for spoliation, Rule 37(b)(2) of the Federal Rules of Civil Procedure empowers the court to impose sanctions "against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information." [35] The case law makes clear, however, that this rule only applies to parties who have violated a court order or acted in bad faith.

As the Tenth Circuit has explained, "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." [36]

■■■ Here, it is clear that PCS neither violated a court order nor acted in bad faith. The destruction of documents was a routine housecleaning operation. It occurred well before the filing of a law suit. Cook maintains that it had placed PCS on notice that it was arguing that the prills were defective. PCS disputes this notice, but at this juncture the court will give Cook the benefit of the doubt. Proceeding on this basis, it is clear that any such notice from Cook was only a very general statement that Cook had concerns about the quality of the prills. Cook alleges that during the course of a telephone call it told PCS it was receiving "off-spec" product. There was never any notice concerning the need for documents from the Clinton plant. Under these circumstances, Cook is not entitled to any evidentiary remedy for spoliation.

In sum, the court has before it no evidence of a defect in the product PCS supplied. As a result, any breach of warranty claim must fail.

### Negligence Claims

Cook's third cause of action alleges that PCS acted negligent by breaching its duty to Cook to manufacture ammonium nitrate

---

32. *Talmadge v. State Farm Mut. Auto. Ins. Co.,* 107 F.3d 21 (10th Cir.1997) (unpublished disposition).

33. *Burns v. Cannondale Bicycle Co.,* 876 P.2d 415, 419 (Utah App.1994) (citations omitted) (emphasis in original).

34. *Id.* at 419.

35. *Procter & Gamble Co. v. Haugen,* 179 F.R.D. 622, 631 (D.Utah 1998) (*quoting Wm. T. Thompson Co. v. General Nutrition Corp. Inc.,* 593 F.Supp. 1443, 1455 (C.D.Cal.1984)).

36. *Aramburu v. The Boeing Co.,* 112 F.3d 1398, 1407 (10th Cir.1997) (citations omitted).

within specification. With respect to the negligence claim, Cook has never spelled out its theory with any precision. Even so, Cook's negligence claim also cannot proceed for two reasons. First, as described above in detail, there is insufficient evidence that PCS manufactured defective AN 83 solution and AN prills or that the alleged defect caused Cook's injury. Second, Cook's negligence claim fails because in a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by the contract.

■■■ The evidence shows that there are many intervening acts which may have caused the break down of the emulsification explosive on February 10, 1999. Without proof of a defect Cook cannot prove a breach of duty or causation of Cook's injury based solely on the fact that Cook suffered an injury. For example, upon receiving each shipment from PCS, Cook added other ingredients, such as acetic acid and citric acid, altering the pH level of the product as Cook deemed necessary.[37] According to the testimony of Merrill Cook, "if you go too far on the acetic, you break [the AN solution] down."[38] Cook also mixed the AN solution and AN prills with oil and emulsifier to manufacture emulsion explosives. According to Cook's expert witness:

> In order to stabilize the oil droplets an emulsifier is used which partitions itself between the oil and the water at the droplet interface. The stability of the

emulsion depends upon there being sufficient emulsifier at this oil-water interface. Since Cook Slurry used a two-component emulsifier, the ratio of the two emulsifiers as well as the concentration of the emulsifiers is important to emulsion stability as is the molecular conformations at the interface.[39]

On May 7, 1998, Cook experienced another breakdown of their emulsification explosive due to contaminated oil.[40] According to Cook, the oil could have been contaminated by either old oil or sludge residue in the delivery vehicle tanker or by contaminants in Cook's storage tanker.[41] Thus, a breakdown in the emulsification explosive can be caused by Cook adding too much acid, contaminants in the materials added to the ammonium nitrate, contaminants in the storage facilities, or in a mistake as to the concentration or ratio of the emulsifiers added to the ammonium nitrate. Therefore, with no proven defect in the goods sold by PCS, drawing a direct causal inference from Cook's injury to the AN 83 solution and AN prills is impossible.

■■■ As a separate and independent basis for rejecting the Cook's negligence claim, the court concludes that Cook's damages are property damage more accurately classified as "economic losses." As a result, Cook's injuries are not recoverable in tort. The economic loss rule followed by most jurisdictions was described generally by the Supreme Court in *East River S.S. Corp. v. Transamerica Delaval*,

---

37. *Id.*, ¶ 54.

38. Cook Depo. vol. I 138:8–13.

39. Ring Depo. ¶ 6.

40. *See* Addendum to Def.'s Reply Memo., Exhibit 12.

41. *Id.*

*Inc.*[42]

Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. See UCC §§ 2–316, 2–719. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power ..., we see no reason to intrude into the parties' allocation of the risk.... The expectation damages available in warranty for purely economic loss give a plaintiff the full benefit of its bargain by compensating for forgone business opportunities.[43]

Both Cook and PCS are experienced and sophisticated merchants able to anticipate the risks of their transactions and contract accordingly to allocate their risk in the most economical manner. In a situation (as is present here) involving a contract for the sale of goods, where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by the contract. Accordingly, the remedy belongs solely in contract law. Thus, because Cook's injury consists solely of economic losses and because there is no evidence of a defect in the AN83 solution or AN prills as described above, the court finds summary judgment is appropriate for PCS on Cook's negligence claim.

## CONCLUSION

The court DENIES plaintiff's motion to strike the affidavit of Jim Hersey (# 99–1).

The court GRANTS defendant PCS's motion for summary judgment on all claims against PCS (# 62–1). In light of this disposition, it is not immediately clear what issues remain for trial on PCS's counterclaim. PCS's initial claim was essentially for accounts receivable, which the undisputed evidence suggests is in fact owed by Cook to PCS. In light of the court's ruling here, it is unclear what defenses Cook would have to the counterclaim. The court invites further discussion of these issues at the upcoming final pretrial conference, including discussion of whether PCS should file a new motion for summary judgment on its counterclaim.

IT IS SO ORDERED.

---

**42.** 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *see also American Towers Owners Ass'n v. CCI Mechanical, Inc.,* 930 P.2d 1182 (Utah 1996).

**43.** *East River S.S. Corp.,* 476 U.S. at 872–73, 106 S.Ct. 2295.